**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Bobby Roy DENNIS, Sr., Sharon Denise Cohen, Clarence Bobby Jennings, Brenda Jewell Hurley, Defendants-Appellants.**

**No. 85–3089.**

United States Court of Appeals,
Eleventh Circuit.

April 14, 1986.

William J. Sheppard, Courtney L. Johnson, Jacksonville, Fla., for Dennis.

Brent D. Shore, Jacksonville, Fla., for Cohen.

Eugene F. Murphy, Jacksonville Beach, Fla., for Jennings.

Howard W. Skinner, Jacksonville, Fla., for Hurley.

M. Alan Ceballos, Asst. U.S. Atty., Jacksonville, Fla., for U.S.

Before HILL, Circuit Judge, and TUT-TLE and HENDERSON *, Senior Circuit Judges.

HILL, Circuit Judge:

This is an appeal from defendant-appellants' convictions and sentences on various narcotics-related charges. The defendants were indicted along with six other individuals, five of whom pled guilty and one of whom remained a fugitive through trial, in a twenty-two count indictment in September of 1984. The defendants filed numerous pre-trial motions, two of which—a motion to suppress certain evidence filed by one defendant and a motion for a continuance filed by another—are relevant to this appeal. Both of those motions were denied.

The jury found all four of the defendants guilty of the offense alleged in Count One of the indictment, which charged them with a five year long conspiracy "to knowingly, willfully and intentionally distribute and possess with intent to distribute quantities of controlled substances, including heroin, cocaine, marijuana, and talwin," in violation of 21 U.S.C. § 846 (1982). Each defendant was also convicted of one or more substantive narcotics offenses. In addition, appellant Bobby Roy Dennis was convicted of engaging in a continuing criminal enterprise that yielded him substantial income and resources, in violation of 21 U.S.C. § 848 (1982), and using a communication facility to facilitate the conspiracy set forth in Count One, in violation of 21 U.S.C. § 843(b) (1982). Appellants Sharon Denise Cohen and Clarence Bobby Jennings were also convicted of making false and material declarations to a federal grand jury, in violation of 18 U.S.C. § 1623 (1982). The sentences imposed will be discussed where relevant below.

## FACTS

The evidence at trial established that appellant Bobby Roy Dennis, Sr. (hereinafter referred to as "Dennis") and Johnny Bernard McClenton, a codefendant who pled guilty and testified at trial, jointly supervised and controlled a massive and highly lucrative five year narcotics distribution enterprise. The enterprise enlisted the assistance of a succession of young women who would package and store the drugs in their homes or apartments, frequently in return for the payment of their rent or other household expenses. The organization also employed street level "lieutenants" who would retrieve the packaged narcotics from the homes in which they were processed and stored and deliver them to street level sellers.

In exchange for financial remuneration, appellant Brenda Jewell Hurley (hereinafter referred to as "Hurley") stored marijuana, cocaine and heroin in her apartment for several months in 1982, during which time the enterprise operated out of that location. Appellant Sharon Denise Cohen (hereinafter referred to as "Cohen"), acting as a street level seller, sold cocaine and heroin out of her home. Appellant Clarence Bobby Jennings (hereinafter referred to as "Jennings") was a street level lieutenant.

On the first day of appellants' trial, the court conducted a lengthy voir dire examination of potential jurors. In response to questions from the court that were directed at learning whether any of the potential jurors harbored any improper bias as a result of their opinions about illicit drugs or had developed any prejudice as a result of their exposure to any pre-trial publicity concerning the case, five jurors stated that they might not be able to render an unbiased decision because of previous experiences unrelated to the case at bar. Following further voir dire examination of the panel by the court, those jurors were excused.

The evidence presented by the government at trial consisted principally of the testimony of a host of witnesses who had been employed in various capacities by the criminal enterprise. Written plea agreements between the government and two of

* See Rule 3(b), Rules of the U.S. Court of Appeals.

those witnesses were introduced into evidence by the government over defense objections. Dennis and Cohen were also implicated in a diary/financial ledger that had been kept by one of the street lieutenants during his tenure with the organization and was introduced at trial. The prosecution's case against Dennis was further supported by a tape recording of a telephone conversation that had been intercepted pursuant to a 1980 court authorized wiretap. Dennis' pre-trial motion to suppress the recording had been denied.

Further facts will be provided where relevant to the analysis below.

## DISCUSSION

Appellants raise numerous claims of error on this appeal. We will discuss the following issues raised by those claims in the order in which we have listed them below:

(1) Whether the trial court erred in admitting into evidence the tape recording made pursuant to a court authorized wiretap in 1980.

(2) Whether the trial court erred in sentencing Hurley, Cohen and Jennings on Count One in the absence of a special verdict indicating which drugs were found by the jury to have been objects of the conspiracy.

(3) Whether appellants Jennings and Cohen waived any right to object to the testimony of the grand jury foreman regarding the materiality of allegedly false statements they made before the grand jury.

(4) Whether the trial court abused its discretion in its conduct of voir dire.

(5) Whether the trial court erred in admitting into evidence the written plea agreements of two government witnesses.

(6) Whether the trial court erred in denying appellant Hurley's motion for a mistrial

after the prosecutor commented on Hurley's character in his rebuttal argument.

(7) Whether the trial court erred in denying appellant Dennis' motion to inquire of the government into the reasons for its exercise of three of its peremptory challenges.

The remainder of the claims raised by appellants are clearly without merit and are addressed together in Part VIII below.

## I. ADMISSIBILITY OF WIRETAP EVIDENCE

The government was permitted to introduce into evidence a tape recording of a telephone conversation between Dennis and David Weinstein, the owner of a local pharmacy, in which Dennis asked Weinstein whether he could provide Dennis with a large quantity of Talwin, a Schedule I narcotic substance. The recording was made on August 1, 1980, pursuant to a court authorized wiretap on a telephone located at the residence of Bonnie Joyce Phelps (a/k/a Bonnie Joyce Jackson). On July 16, 1980, as part of an investigation into essentially the same criminal enterprise that is the subject of this case, Assistant United States Attorney Thomas E. Morris had applied for and received authority to intercept and monitor communications over the home telephone lines of Dennis and Phelps, who was then Dennis' girlfriend.[1] Attached to and made a part of that application by reference was an affidavit executed by Federal Bureau of Investigation Special Agent Dennis Erich, setting forth, *inter alia*, the reasons why it was believed that alternative investigative techniques would not achieve the objectives the wiretap could achieve. On July 28, Morris filed a second application seeking authority to intercept communications over Phelps' telephone line at a new address to which she had moved. The court granted the application, resulting in the interception of the conversation be-

---

1. The government has stated that the 1980 wiretap did not yield evidence sufficient to warrant prosecution then, and that the investigation was terminated shortly thereafter. The investigation was reactivated in 1984 with an extensive grand jury investigation. During the grand jury inquiry it became clear that one intercepted conversation might be relevant as evidence in this case. It is for that reason that the conversation that is at issue here was intercepted so far in advance of prosecution.

tween Dennis and Weinstein on August 1. The July 28 application included an affirmation of the applicant's belief that "normal investigative procedures appear unlikely to succeed," and incorporated by reference the prior affidavit of Special Agent Erich, which was said to "explain[ ] why normal investigative procedures have failed or reasonably appear unlikely to succeed if continued, or reasonably appear unlikely to succeed if tried." [2]

Appellant Dennis challenges the legal sufficiency of the July 28 application on this appeal, arguing that it fails to satisfy the statutory requirement that a wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c) (1982). Appellants claim support for their position in dicta from this court's opinions in *United States v. Bascaro*, 742 F.2d 1335 (11th Cir.1984), and *United States v. Domme*, 753 F.2d 950 (11th Cir.1985). In both of those cases we approved the incorporation by reference of prior affidavits in an amended application that had been made necessary only because of a change in telephone number at the same address. In both cases the court distinguished amended applications arising from a change in the address of the person whose conversations were being intercepted. Indeed, the *Domme* court stated:

> Appellants point to *Bagley v. State*, 397 So.2d 1036 (Fla.App.1981), and *Wilson v. State*, 377 So.2d 237 (Fla.App.1979), which held amended applications to be insufficient as a matter of state law when they merely incorporated information contained in earlier applications. Their argument, however, is foreclosed by our decision in *Bascaro*. There, the government obtained an amended wiretap order, which was sought by incorporating the original application, because the subject of the wiretap had changed

one of his phone numbers before electronic surveillance had begun. Appellants in *Bascaro* raised the identical argument presented here. In distinguishing *Wilson* and *Bagley*, the *Bascaro* court observed that both of those cases involved the wiretap subject's change in residence. 742 F.2d at 1347–48; *see Bagley*, 397 So.2d at 1038; *Wilson*, 377 So.2d at 238–39. In such circumstances, incorporation of an original application by reference does not satisfy the requirement imposed by federal and Florida statutes that the application contain a complete statement about why alternative investigative procedures have been unsuccessful, or would be futile or too dangerous. 742 F.2d at 1347–48; *see* Fla.Stat.Ann. § 934.09(1)(c) (West 1973); 18 U.S.C. § 2518(1)(c). A mere change in telephone number without change in residence could not have affected the efficacy of alternative methods of investigation. 742 F.2d at 1348. Thus we conclude, as did the *Bascaro* court, that the failure to restate the information contained in the initial application did not violate Florida law.

*Domme*, 753 F.2d at 955. According to Dennis, this court in *Domme* and *Bascaro* correctly recognized that, to satisfy the requirements of 21 U.S.C. § 2518(1)(c), an amended application seeking to continue previously authorized monitoring of a person's telephone at another location must include a new statement of the reasons why other investigative procedures are unlikely to succeed at the new location, and may not incorporate by reference such information from a previously prepared affidavit which refers to the original location.

██ Appellant urges a *per se* rule, however, in a context in which one is neither necessary nor desirable. The dicta of *Domme*, to the extent it supports such a rule, is simply too sweeping in its condemnation of the practice of incorporating prior affidavits, where relevant, into wiretap ap-

2. The July 28 application and supporting affidavits also set forth in considerable detail the facts alleged to constitute probable cause to believe that the electronic monitoring for which authority was sought would secure important evidence of unlawful activity.

plications. We have previously observed that "the purpose of the requirement in section 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir.1974), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975).[3] As its legislative history indicates, the statute contemplates that "the showing be tested in a practical and commonsense fashion." S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News pp. 2112, 2190, *quoted in United States v. Alfonso,* 552 F.2d 605, 611 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977). It will indeed often be the case that the information contained in an earlier affidavit that has been incorporated by reference into a second wiretap application will not suffice to inform the issuing judge of the difficulties involved in the use of alternative investigative techniques at the new location. It is the nature of the information that is provided, however, and not the means by which it is incorporated into the application, which determines whether the information constitutes "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 21 U.S.C. § 2518(1)(c) (1982). The fact that some or all of the information has been incorporated by reference is alone irrelevant. Further, the information provided in the second application may satisfy the substantive requirement of section 2518(1)(c) without providing any additional explana-

tion, applicable exclusively to the new location, of reasons why alternative investigative procedures are not likely to succeed there, since information that adequately informs the issuing judge of the limitations of alternatives to electronic surveillance in a given case may well apply to communications facilities at more than one location.[4]

■ In this case, Special Agent Erich's initial affidavit, which was incorporated by reference into the application at issue here, included the following information:

### Need for Interception

The information developed thus far in this investigation has come from confidential sources, physical surveillances and court authorized pen registers. These investigative techniques have to date not succeeded in providing sufficient evidence to sustain successful prosecution of all of the principals in this matter, nor have they disclosed the identities of all persons involved, or the source of controlled substances. These investigative techniques have not been successful in providing sufficient information of evidentiary value concerning transfer of narcotics, obtaining money for narcotics operations or the content of conversations between the principals concerning their criminal activities. It does not appear that the continued use of these normal investigative techniques is likely to be sufficiently successful in the future for the following reasons:

Confidential sources mentioned herein all have stated they will not testify about the information they have provided for fear of their personal safety, as well as personal recriminations that would be

---

**3.** The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). All Fifth Circuit decisions cited in this opinion are binding upon this panel.

**4.** Such an approach is consistent with that taken in *Bascaro* and *Domme,* despite some unnecessarily broad language in the latter to the contrary. Both cases rejected excessively formalis-

tic approaches in situations in which the change in circumstances that necessitated the amended applications could not have affected the efficacy of alternative methods of investigation. In this case, too, we decline to find section 2518(1)(c) to require a mere change in the form in which the necessary information is provided to the issuing judge, as long as the information that is provided is sufficient to serve the purposes of the statutory provision.

forthcoming if it were known that they have provided this information. In addition, all confidential informants have been contacted and refused to engage in the consensual monitoring of their conversations with individuals in this investigation. Special Agent Dennis P. Erich and other Special Agents of the Federal Bureau of Investigation, Bureau of Alcohol, Tobacco and Firearms and duly sworn law enforcement officers of the State of Florida, have instituted numerous surveillances in the past six months in an attempt to determine the extent of the narcotics distribution operation. The principals in this matter are extremely cognizant of law enforcement physical surveillance [as] evidenced by their routine utilization of a wide variety of vehicles in their contacts with their associates. Through recent physical surveillance and Department of Motor Vehicle inquiries, it has been determined that Bobby Roy Dennis has registered to him seven motor vehicles and has access to and uses numerous others. It has been determined also through physical surveillances that Bobby Roy Dennis changes vehicles regularly in the course of his contacts with his associates and frequently rotates the license plates on the various vehicles at his disposal. In addition, physical surveillances and pen registers utilized in this investigation show that the activities of Bobby Roy Dennis and his associates in furtherance of their operation have no set pattern. These individuals are active at varying times, day and night, seven days a week, and their activities typically involve evasive use of vehicles.

It is felt that the use of a Grand Jury to subpoena Bobby Roy Dennis and others, the interviewing of these individuals and the subpoenaing of the telephone records of these individuals would not be productive in this investigation and would be unfavorable due to the fact that such questions will alert the subjects of this investigation and cause a change in the method of their operations.

Search warrants were conducted on two occasions, March 7, 1980, and March 21, 1980, at a bar owned by Bobby Roy Dennis and even though a quantity of heroin and cocaine was recovered, this evidence failed to reveal the full extent of this operation and offer sufficient evidence to indict the principals in this matter.

Branson O. Arflin, Sr., has been the target of criminal investigations by various law enforcement agencies in the Jacksonville area. The Jacksonville Office of the Federal Bureau of Investigation has attempted on two occasions in the past five years to infiltrate alleged criminal activities on the part of Arflin and his associates with unsuccessful results. The Jacksonville Sheriff's Office has assisted in these efforts in addition to their own numerous investigations of Arflin and his associates. Information regarding Arflin financially backing various narcotics operations in the Jacksonville area has been known to the Drug Enforcement Administration at Jacksonville, but their efforts to infiltrate these operations have been unsuccessful. Arflin and his associates have been the subject of several investigations by the Alcohol, Tobacco and Firearms Office at Jacksonville for alleged violations of Federal Firearms Statutes. No major investigations have been successful to date by Alcohol, Tobacco and Firearms regarding Arflin or his associates.

. . . .

This interception is necessary in order to identify other individuals who are involved with Bobby Roy Dennis, Sr., Branson O. Arflin, Sr., also known as Bill Arflin, Ernest Gibson, Jr., Tammy Almon, Willie Lee Bartley, Anthony Jerome Stinson, James Alfred Clark, Steve Almon, Daryl Lamont McClenton, Joseph Hill, Bobby Roy Dennis, Jr., Lamar Solomon and Eddie Lee Grant, Jr., and others yet unknown who are involved in the above enumerated offenses, and attempt to show the full scope of their operation and develop additional evidence neces-

sary for the successful prosecution of the principals and conspirators.

. . . .

Based on personal knowledge of the facts of this investigation, information furnished by other Special Agents of the Federal Bureau of Investigation, Bureau of Alcohol, Tobacco and Firearms and duly sworn law enforcement officers of the State of Florida, and the manner in which the violations enumerated herein are carried out, the interception of wire communications, combined with cautious and discreet physical surveillances, appears to be the only available investigative technique which has a reasonable likelihood of securing the evidence necessary to fully identify the greatest number of persons involved in committing the above-enumerated offenses with the persons listed above, to fully show the scope of the conspiracy and criminal offenses listed, and to obtain sufficient evidence to prove the elements of those offenses listed.

Special Agent Erich's affidavit, as incorporated into the July 28 application at issue in this case, easily constitutes "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 21 U.S.C. § 2518(1)(c) (1982). Appellant Dennis has suggested no plausible factual basis for a finding that this affidavit, initially prepared to accompany the July 16 application to monitor Dennis' home telephone and Phelps' telephone at her previous address, is not also sufficient to advise the issuing judge of the limitations of investigative alternatives to electronic surveillance at the new address. Although the affidavit does not refer to the new address, we find the information that is contained therein and thus incorporated by reference into the

July 28 application to be sufficient to satisfy the substantive requirement of section 2518(1)(c), as applicable to the government's July 28 request.

If the need for electronic surveillance to satisfy the investigation's objectives had initially arisen as a result of characteristics of the place where the communication facility was then located, we would obviously have a very different case. In this case, however, it was the nature of the suspected activity being investigated as well as the information about that activity that was being sought that substantiated the wiretap applicant's claim that electronic surveillance was necessary. The information provided in the initial affidavit thus applied as fully to the new address as it did to the old one, and the government in the July 28 application was not required to provide any additional information in order to comply with the federal wiretap statute.

## II. THE SPECIAL VERDICT ISSUE

The jury found Hurley, Cohen and Jennings guilty of the offense charged in Count One of the indictment, which alleged that over a five year period they, along with others, "did knowingly, willfully and intentionally combine, conspire, confederate, and agree together . . . to knowingly, willfully and intentionally distribute and possess with intent to distribute quantities of controlled substances, including heroin, cocaine, marijuana, and talwin, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846." [5] Hurley, joined by Dennis, had requested that the jury be asked to return a special verdict on this count of the indictment, specifying which of the object drugs were found by the jury to have been objects of the distribution conspiracy in the event a guilty verdict was returned on Count One.[6] Hurley's request

---

**5.** The jury also found Dennis guilty of the offense charged in Count One of the indictment. The trial court vacated Dennis' conviction on Count One, however, in light of his conviction of the continuing criminal enterprise count.

*See Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977).

**6.** Jennings and Cohen did not join in this request. The government has not argued that the request made by Hurley and Dennis was insufficient to preserve the issue insofar as their sen-

was opposed by the government and was denied.[7] The maximum term of imprisonment that could be imposed on a first-time drug offender for a conspiracy that occurred when the conspiracy proved in this case occurred and whose object was possession with the intent to distribute less than 1,000 pounds of marijuana is five years, while up to fifteen years may be imposed for a similar conspiracy involving heroin or cocaine. *See* 21 U.S.C. § 846 (1982). *Compare* 21 U.S.C. § 841(b)(1)(A) (1982) *with* 21 U.S.C. § 841(b)(1)(B) (1982).[8] The trial court sentenced Jennings, Cohen and Hurley to terms of seven, ten and four years, respectively as a result of their convictions on Count One. Noting that United States Parole Commission guidelines would suggest that she spend more time in prison for joining a heroin or cocaine distribution conspiracy than for joining a conspiracy to distribute marijuana, Hurley moved at sentencing to strike any references to heroin and cocaine from the presentence investigation report's description of the conspiracy conviction. That motion was denied. Appellants argue that, in the absence of a special verdict indicating which of the four object drugs listed in Count One of the indictment were found to have been objects of the conspiracy of which each was convicted, the court could not know whether the jury had found the defendants guilty of

participation in a conspiracy whose objects included the distribution of heroin or cocaine, as the sentencing judge assumed, or whether the jury instead intended to convict the defendants of a conspiracy to distribute only marijuana. As a result, appellants argue, the court erred in denying Hurley's motion to strike from the PSI the language indicating that she had been convicted of participating in a cocaine or heroin conspiracy, and in imposing upon Jennings and Cohen prison sentences in excess of five years on Count One.[9]

We find appellants' claim to be without merit.[10] Where a section 846 conspiracy count charges the defendants with conspiring to distribute two or more drugs for which Congress has prescribed different ranges within which the sentence imposed may fall, the trial judge should, by use of a special interrogatory or otherwise, require the jury to return a verdict on the conspiracy count that will indicate clearly on its face which of the charged drugs the defendants were found by the jury to have conspired to distribute. In the absence of such a verdict, it may well be impossible in many cases for the sentencing judge to determine which drugs the jury found to have been involved. In this case, however, the trial court's failure to grant the request

tences are concerned, so we need not consider that question at this time.

7. In particular, counsel for the government argued as follows:
I oppose [the request for a special verdict.] I don't think the law requires it. I think the conspiracy law does not require them to find that they knew what every other arm of the conspiracy was doing. They can be guilty of the conspiracy if they aided and abetted the conspiracy, if they were a member for a short period of time for the conspiracy. It doesn't require them to have knowledge of what Bobby Dennis was doing with David Weinstein, it doesn't have—require Brenda Hurley to have knowledge of what was happening out on Second and Market when she wasn't there. I would oppose that. I think the general verdict form is sufficient.

8. These penalty provisions were amended by Pub.L. 98–473, Title II, §§ 502, 503(b)(1), (2), Oct. 12, 1984, 98 Stat. 2068, 2069, but the distinctions between permissible penalties for dif-

ferent drug distribution conspiracies remain as significant as they were under prior law. *See generally,* 21 U.S.C.A. § 841 (West 1985 supp.).

9. The government argues that since Hurley was not sentenced to a lengthier term of imprisonment than she could have been sentenced to under the conviction as she construes it, any error in failing to obtain a special verdict or credit her construction of the verdict that was obtained was harmless insofar as she is concerned. Since we find no error, we need not address this argument.

10. In *United States v. Harrell,* 737 F.2d 971 (11th Cir.1984), a criminal defendant made an argument similar in many respects to the argument made by appellants in this case. Because no contemporaneous objection to the general form of the verdict had been made in that case, however, we did not resolve the substantive issue thus raised. *Id.* at 982.

for a special verdict did not result in reversible error.

Appellants may not prevail on their claim simply by showing that they were convicted under conspiracy instructions which, on their face, might permit the jury to return a guilty verdict if the conspiracy found did not involve heroin or cocaine. It must also appear that the evidence would support such a construction of the verdict actually obtained.[11] In the absence of the latter, there can be no genuine ambiguity in the jury's verdict, as any purported ambiguity would only have been created by a reading of the verdict that was not supported by the evidence in the case.[12] In this case, we accept appellants' argument that the instructions to the jury on the conspiracy count could be read to allow the jury to convict appellants of the conspiracy charged in Count One of the indictment even if that conspiracy were not found by the jury to have been a conspiracy to distribute cocaine or heroin.[13] When the

**11.** Those defendants who wish to maintain both that the jury's verdict is ambiguous regarding the drugs that were found to have been involved and that the evidence is insufficient to support a conviction under either reading of the verdict obtained may find it difficult to argue both positions, if they feel obligated to demonstrate both the existence of ambiguity in the jury instructions and an evidentiary basis for the more lenient construction they urge on the ambiguity in the verdict claim. We are confident, however, that the government's counter-argument on the sufficiency of the evidence claim will in most cases suffice to apprise the reviewing court of the strength of the evidence supporting the construction of the verdict that is more favorable to the defendant, as the government will have to concern itself with the possibility that the court will agree with the defendant that the evidence does not support a conviction under the construction that would authorize the stricter sentence. In that event, the government would presumably wish to be certain that it had provided the reviewing court with a basis for sustaining the conviction under the alternative construction that is not as favorable to the government as the one it might prefer, but is better than no conviction on the count at all. The government would thus make the evidentiary showing that the defendant should make in the absence of the sufficiency of the evidence claim. By prudent preventive lawyering, the government may avoid any inconvenience it might be put to in defending both insufficiency of the evidence and ambiguity in the verdict claims at once by joining rather than opposing the request for a special verdict that the defendant will have to have made in order to place the government in this awkward defensive posture.

**12.** In other words, under such circumstances, the only ambiguity would appear in the instructions to the jury, read in isolation from the case. That does not, in every case, yield an ambiguous verdict.

**13.** The court charged the jury on the conspiracy count of the indictment as follows:

Count one of the indictment charges that from in or about early 1979 through in or about June of 1984, at Jacksonville, in the Middle District of Florida, that each of the defendants combined, conspired, confederated and agreed together and with other persons to distribute and possess with intent to distribute, quantities of controlled substances, including heroin, cocaine, marijuana and Talwin, in violation of Title 21, United States Code, sections 841(a)(1) and 846.

Title 21, United States Code, Section 841(a)(1) cited in this indictment provides in pertinent part as follows: "It shall be unlawful for any person knowingly or intentionally to possess with intent to distribute a controlled substance."

Heroin, cocaine, marijuana and Talwin are controlled substances within the meaning of the law.

In order to establish the offense proscribed by this statute, the Government must prove each of the following elements beyond a reasonable doubt: First, that the defendant knowingly and willfully possessed heroin, cocaine, marijuana or Talwin as charged.

And, second, that he possessed the substance with the intent to distribute it.

To possess with intent to distribute simply means to possess with intent to deliver or transfer possession of a controlled substance to another person with or without any financial interest in the transaction.

Now, section 846 of Title 21 provides in pertinent part as follows: "Any person who conspires to distribute and possess with intent to distribute a controlled substance, shall be guilty of an offense against the United States." So under this law a conspiracy is a combination or agreement of two or more persons to join together to attempt to accomplish some unlawful purpose. It is a kind of partnership in criminal purposes in which each member becomes the agent of each—every other member. The gist or essence of the offense is a combination or mutual agreement by two or more persons to disobey or disregard the law.

The evidence in the case need not show that the alleged members of the conspiracy entered into any express or formal agreement or that they directly stated between themselves

jury's verdict is examined in light of the evidence presented at trial, however, there can be no question that the single conspiracy of which all the defendants were convicted was not a conspiracy to distribute only drugs for which no more than five years in prison may be imposed. Rather, the evidence is overwhelming that the massive conspiracy charged and proved in this case included among its objectives the distribution of heroin and cocaine. Appellants have identified no evidence that the conspiracy was limited in its objectives to the distribution of drugs for which only five years imprisonment may be imposed. Further, appellants Jennings, Hurley and Cohen were each convicted of substantive offenses involving heroin and cocaine which appear clearly from the evidence to have occurred pursuant to the distribution conspiracy charged in Count One.[14] Taking into consideration the whole of the evidence presented at trial as well as the unchallenged verdicts the jury reached on the substantive counts, we find it clear beyond a reasonable doubt that, as the district court concluded, the jury by its verdict found appellants to have joined a conspiracy to distribute heroin and cocaine. We therefore reject appellants' claim that the court erred in sentencing the defendants as it did on the conspiracy count and in denying appellant Hurley's motion to strike certain material from her PSI.

The government opposed the defense request for a special verdict, *see supra* note

the details of the scheme and its object or purpose or the precise means by which the object or purpose was to be accomplished. Similarly, the evidence in the case need not establish that all of the means or methods set forth in the indictment were in fact agreed upon to carry out the alleged conspiracy. What the evidence in the case must show beyond a reasonable doubt is, one, that two or more persons in some way or manner positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment. And two, that the particular defendant with whom you are then—whom you are then considering, willfully became a member of such conspiracy.

One may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. So if a defendant, with an understanding of the unlawful character of a plan, knowingly and willfully joins in an unlawful scheme on one occasion, that is sufficient to convict him for conspiracy even though he had not participated at earlier stages in the scheme and even though he played only a minor part in the conspiracy.

Of course, mere presence at the scene of an alleged transaction or event or mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together to discuss common aims and interests does not necessarily establish proof of the existence of a conspiracy.

Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some object or purpose of the conspiracy, does not thereby become a conspirator.

You are further instructed, with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must then determine who were the members of that conspiracy. If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty, you must find that he was a member of the conspiracy charged in the indictment and not some other separate conspiracy.

14. Hurley and Cohen were found guilty of possession with intent to distribute heroin, cocaine and marijuana, as charged in Count Ten of the indictment. Hurley and Jennings were also found guilty of two counts each of possession with intent to distribute heroin and cocaine. Those offenses were all alleged in the indictment to have occurred within the period of time the conspiracy was alleged to have existed. Although Cohen was not found guilty of a substantive offense involving only heroin and cocaine it is clear that the jury by its verdict on Count Ten convicted her of possessing heroin and cocaine with the intent to distribute the drugs, as the only evidence introduced at trial regarding Cohen concerned her purchases of heroin and cocaine from other members of the distribution conspiracy for the purpose of reselling it.

7, and has argued on this appeal that such a procedure would have been inappropriate. Although special verdicts have, for good reason, long been disfavored generally in the criminal law, *see generally United States v. Spock*, 416 F.2d 165, 180–83 (1st Cir.1969), they have commonly been approved where necessary to determine the punishment that should be imposed. *See e.g., Jalbert v. United States*, 375 F.2d 125, 126 (5th Cir.), *cert. denied*, 389 U.S. 899, 88 S.Ct. 225, 19 L.Ed.2d 221 (1967). *See generally* 3 C. Wright, Federal Practice and Procedure § 512 (2d ed. 1982). Moreover, opposing such a motion in a case charging a drug distribution conspiracy in language similar to the terms of the indictment and jury charge in this case appears to serve little useful purpose while risking a great deal. In this case, we are able to conclude beyond a reasonable doubt that the jury intended to convict the defendants of a heroin/cocaine distribution conspiracy on the basis of the overwhelming strength of the evidence in support of that construction, to the exclusion of the construction urged by appellants, and the verdicts returned on the related substantive counts charged in the indictment. But we are confident that it will be a rare case indeed in which instructions like those given in this case will not result in an ambiguous verdict if evidence relating to both marijuana and heroin or cocaine is introduced and the jury is not asked to indicate expressly which drugs it finds the defendants to have conspired to distribute. This is because the reviewing court in such a situation may not examine the evidence presented at trial to determine whether the jury, if properly instructed, *could* have or even *should* have found a heroin/cocaine conspiracy and returned a verdict indicating as much; rather, the court's inquiry is confined to determining beyond any reasonable doubt whether the jury *did* find such a conspiracy and whether it intended the verdict it returned to reflect that determination. Only

in that manner may we avoid invading the special province of the jury in a criminal case both to find the facts and apply the law as it sees fit. Thus the prosecution's interest in obtaining a jury verdict that will be construed to reflect a finding of a heroin/cocaine conspiracy in any case in which one has been proved can only be frustrated where the government opposes a defense request for a special verdict in a case involving a conspiracy charge similar to the one at issue here.

### III. TESTIMONY OF THE GRAND JURY FOREMAN

█ Appellants Jennings and Cohen argue that the trial court erred in allowing the foreman of the grand jury that indicted the defendants to testify before the jury regarding the materiality of statements they made before the grand jury that were later alleged in the false declaration counts of the indictment to have been false. To prove the offenses charged in the false declaration counts of the indictment, the government had to prove that the allegedly false statements made to the grand jury were "material." 18 U.S.C. § 1623(a) (1982).[15] The materiality of the allegedly false declaration is a legal question to be decided by the court rather than an issue of fact for the jury. *See United States v. Damato*, 554 F.2d 1371, 1373 (5th Cir.1977). As a result, evidence bearing solely on materiality should generally be received outside the presence of the jury. *See Harrell v. United States*, 220 F.2d 516, 520 (5th Cir.1955). Appellants argue that the trial court thus committed reversible error in allowing the grand juror to testify as he did concerning materiality before the jury. The government responds that the challenged testimony was relevant to other issues properly considered by the jury in this case, and that its admission in the presence of the jury was therefore not error. *See United States v. Nixon*, 634 F.2d 306, 311

---

**15.** The test of materiality is "whether the false testimony was capable of influencing the tribunal on the issue before it." *Blackmon v. United States*, 108 F.2d 572, 573 (5th Cir.1940). *See*

*also United States v. Damato*, 554 F.2d 1371, 1372 (5th Cir.1977); *Barnes v. United States*, 378 F.2d 646, 649–50 (5th Cir.1967), *cert. denied*, 390 U.S. 972, 88 S.Ct. 1056, 19 L.Ed.2d 1184 (1968).

(5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981).

 In this case, however, we need not decide whether the trial court erred in allowing the challenged testimony to be given in the presence of the jury, as no defendant objected to the testimony at trial on the grounds they now urge on appeal. The only objections made to the testimony at issue here were on hearsay and relevance grounds. The trial court's rejection of those bases for the defendants' objections to the grand juror's testimony is not challenged on this appeal. To preserve an issue at trial for later consideration by an appellate court, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought. A general objection or an objection on other grounds will not suffice. *See United States v. Haynes,* 573 F.2d 236, 241 (5th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Hicks,* 524 F.2d 1001, 1004 (5th Cir.1975), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976). Since the defendants did not object to the grand jury's testimony on the grounds they now urge on appeal, we are limited in our review to reversal on those grounds for plain error. *See* Fed.R.Crim.P. 52(b). Finding no such error in the admission of the testimony that is challenged on this appeal, we reject appellants' claim for reversal on the grounds set forth above.

## IV. THE ADEQUACY OF VOIR DIRE

On the first day of trial, the trial court conducted a lengthy voir dire examination of the panel of prospective jurors. A principal area of inquiry at voir dire was the extent to which potential jurors had been exposed to and affected by possibly prejudicial pre-trial publicity concerning the case. The court also inquired of the panel whether any of them felt that they might not be able to afford the defendants a fair trial as a result of their opinions about illicit drugs. In response to the court's inquiries, five jurors indicated that they might not be able to render an unbiased decision and were later excused by the court from service. The relevant portion of the voir dire examination is detailed in the trial transcript as follows:

Is there anyone else who has any knowledge about this case from any source whatsoever? If it should develop, if you are selected as a juror, and after you hear some of the evidence in the case, that maybe you might read something about it and just right now don't recall having read about it, but after having heard some of the evidence maybe it might trigger something in your memory as to something you might have read or seen on television or heard on the radio for that matter, is there anyone here who could not place that outside of their minds and determine this case solely on the basis of evidence which will be presented in this courtroom and the law which I will instruct you to follow at the close of the case? Is there anyone who feels that he could not do that? And if so, please raise your hand. Yes, ma'am.

JUROR: I'm Mrs. Wyckoff. I don't believe I could be impartial in this trial. My oldest child was murdered in a drug killing. I don't really believe I could be impartial.

THE COURT: Miss Wyckoff, the incident about which you speak has nothing to do with any of the defendants in this case?

JUROR: No sir, I'm just—it's my personal feeling.

THE COURT: Now—all right, Miss Wyckoff, you may be seated and thank you very much.

Ladies and gentlemen—I appreciate your telling the Court that, Mrs. Wyckoff.

Ladies and gentlemen, this case involves allegations of conspiracy to possess with intent to distribute various drugs. Does any one of you have any opinions with regard to drugs which makes you feel that you could not give

these defendants and the Government a fair and impartial trial?

All right, let's start right in the front row, please.

JUROR: I don't know if I would be fair—

THE COURT: Stand up, please and tell us your name so we can all hear you.

JUROR: I've work[ed] on the railroad as a hostess some years and years back and I've seen what drugs does—

THE COURT: Wait a second, wait a second.

JUROR: Okay. I don't know, I've seen what drugs do to people. I don't know whether I would be biased or not. I might be and I might not be. But I am very much against it, so this is the way I feel about drugs.

THE COURT: What is your name, please?

JUROR: Margaret Bell.

THE COURT: All right, Miss Bell.

All right, on the front row, anyone else?

On the second row to my right, anyone else?

On the third row, anyone else?

All right on the fourth row?

JUROR: Marjorie Rigdon.

THE COURT: Yes, ma'am?

JUROR: I'm not really sure that I could be unbiased or anything because of my oldest daughter taking drugs.

THE COURT: All right, Miss Rigdon, thank you very much. Have a seat.

Anyone else? Yes, Sir.

JUROR: Noah S. Simmons. Due to experience that I would care not to discuss right now, I think I would probably find difficulty in being unbiased in a decision where drugs were involved.

THE COURT: All right. Thank you, Mr. Simmons. I appreciate your candor.

Yes sir.

JUROR: My name is Erich Gussow and I could not render a fair decision for the simple reason my son died three years ago of an overdose and I have some very strong feelings about it.

THE COURT: All right. Thank you, Mr. Gussow.

Appellants moved to strike the entire panel due to the assertedly prejudicial effect on the panel of the statements made by the five panel members who indicated their concerns about possible bias and were later excused. Alternatively, the defendants requested that the remaining panel members be further examined to determine the prejudicial effect of the statements that were made. That motion was denied, and the court conducted no further inquiry directed specifically at learning the extent of any bias that may have resulted from the panel's exposure to the responses of the five excused jurors. Instead, the court continued its voir dire examination by explaining to the potential jurors that the defendants were presumed innocent until proven guilty and that the presumption of innocence is a guiding principle in the administration of criminal justice. The panel members were asked whether any one of them "could not give these defendants the presumption of innocence and not vote for a guilty verdict unless the Government proved guilt beyond a reasonable doubt." No juror indicated any doubt about his or her ability to respect the presumption of innocence. The court further asked numerous other questions directed at uncovering any basis for doubting the willingness or ability of any member of the panel to decide the case in accordance with the instruction on the law that would be given by the court. No juror revealed any basis for suspecting bias that was not immediately followed up with specific questions directed at determining the nature and extent of any possible bias.

■■■■ Appellants argue that the trial court's decision not to examine the panel members individually to determine the extent of any prejudice resulting from the statements made by the five excused jurors was an abuse of discretion.[16] Where state-

16. Rule 24(a) of the Federal Rules of Criminal Procedure commits the conduct of voir dire to

ments made by potential jurors at voir dire raises the spectre of "potential actual prejudice" on the part of the remaining panel members, "specific and direct questioning is necessary to ferret out those jurors who would not be impartial." *United States v. Corey,* 625 F.2d 704, 707 (5th Cir.1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1377, 67 L.Ed.2d 354 (1981). *See also United States v. Nell,* 526 F.2d 1223, 1229–30 (5th Cir.1976). Where "the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present," however, no abuse of discretion may be found. *United States v. Holman,* 680 F.2d 1340, 1344 (11th Cir.1982) (quoting *United States v. Nell,* 526 F.2d at 1229).

■■■ In *United States v. Tegzes,* 715 F.2d 505 (11th Cir.1983), we found this standard satisfied in a case that presented essentially the same issue we are faced with here. In that case, one juror stated during voir dire that "A very dear friend of mine has not left his house in seven years because of brain damage from drugs." *Id.* at 506. As a result of this statement and other statements made by other jurors concerning experiences with drugs, the court inquired whether any panel member held a belief or opinion regarding drug offenses that would render it impossible for him or her to serve as a fair and impartial juror. One juror, who was subsequently excused for cause, stated that because of his opinions and beliefs concerning drugs he could not serve fairly and impartially. Later, during the selection of alternate jurors, a prospective alternate said "I did see my youngest son, through dope, OD before he was 18 years old." *Id.* The defendant moved for a mistrial on the grounds that the prospective alternate's statement had tainted the other jurors on the panel. The trial judge dismissed the juror but denied the motion for a mistrial. The court also refused a request to question the jurors

individually or collectively to determine the impact the excused alternate's remarks had on the ability of the remaining jurors to be fair and impartial. *Id.* We held that the court did not err in its conduct of voir dire, explaining our decision as follows:

> Ms. Wade's remark does not raise the spectre of potential prejudice in other jurors that would require the court to ask additional questions of the panel. The statement did not constitute an opinion concerning the guilt or innocence of the defendants, nor did it relate to knowledge about the facts, parties, or witnesses involved in this case. The fact that other jurors may now know that criminal conduct leads to tragic results does not constitute "potential actual prejudice" toward the accused. Appellants' suggestion that mere awareness of the adverse consequences of crime induces bias toward the defendant is highly speculative and falls far short of the potential actual prejudice which would mandate additional voir dire.

*Id.* at 508. In this case, too, we find the statements made by the five panel members who were excused to have been insufficient to require the court to conduct additional voir dire of the remaining panel members. At most, the statements served to heighten the remaining jurors' awareness of some of the possible consequences of drug use. We are not convinced that they posed any threat to the fairness and legality of the defendant's trial.

Appellants also challenge the adequacy of the trial court's inquiry into the racial attitudes of the prospective jurors at voir dire. All of the defendants in this case are black, as were the majority of the witnesses called by the government. The defendants were charged with engaging in a conspiracy to distribute drugs in a predominantly black community in Jacksonville.

the sound discretion of the trial court, subject to the essential demands of fairness. *See generally United States v. Delval,* 600 F.2d 1098, 1102 (5th Cir.1979). This discretion extends to the court's decision whether to ask particular questions of

potential jurors as well as its decision whether to examine the panel members individually or as a group. *See United States v. Holman,* 680 F.2d 1340, 1347–48 (11th Cir.1982).

The panel of prospective jurors, like the jury chosen for the trial, was predominantly white. Although appellants submitted a number of questions directed at revealing any effect that racial prejudices were likely to have on the jury's deliberations, the court asked of the jury only the following:

> Ladies and gentlemen, each of the defendants in this case is a black citizen. Would any of you fail to give the defendants the same fair trial that you would give anyone else, solely because of their race?

No juror responded, and voir dire proceeded on to other areas of inquiry. Appellants argue that the circumstances of this case required the trial court judge to conduct a more thorough investigation into the racial attitudes of the prospective jurors.

 Failure to honor a request for voir dire into racial attitudes that is more searching than that conducted in this case will constitute reversible error "only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." *Rosales-Lopez v. United States*, 451 U.S. 182, 191, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981). Thus, where the government or the defendant is expected to place in issue at trial matters involving allegations of racial or ethnic prejudice, or where the circumstances of the case reveal a violent criminal act perpetrated against a victim of a different racial or ethnic group, the Supreme Court has indicated that general inquiries like the inquiry made in this case may not suffice. *Id.* at 191–92, 101 S.Ct. at 1635–36. The mere fact that the jury is predominantly of one racial or ethnic group, while the defendants, most of the witnesses and the alleged victims of the offense are of another, however, is clearly insufficient to require further voir dire. Those are not circumstances that alone create a "reasonable possibility" that racial or ethnic prejudice will influence the jury. We therefore find no reversible error in the conduct of voir dire in this case.

## V. ADMISSION OF PLEA AGREEMENTS

The first witness called by the government was Johnny Bernard McClenton. The terms of McClenton's plea bargain agreement with the government were discussed without objection on direct examination. On cross-examination, defense counsel attacked McClenton's credibility, making repeated and specific references to the plea agreement. On re-direct, the government introduced, over defense counsel's objections, McClenton's written plea agreement. Defense counsel objected to the introduction of the exhibit on the grounds that it was a self-serving document prepared by the government in anticipation of this litigation, and that it was cumulative and repetitious. On the last day of the prosecution's presentation of its case in chief, Patricia Porter was called to testify. The government moved to introduce Porter's written plea agreement during her direct examination. The exhibit was admitted over defense counsel's objection that it was self-serving. In his closing argument, the prosecutor referred to the McClenton plea agreement as follows:

> [McClenton's] looking at an aggregate sentence of up to twenty years. He could get less, but that's going to be Judge Moore's job to decide, and Johnny McClenton knows that his plea agreement is in this case and you can look at it. If he fails to tell the truth, he has everything to lose. That plea agreement can be taken away from him. The United States can say, Mr. McClenton, you still have to plead guilty to what you pled to and we can charge you with all the things that were dropped against you. He has every reason in the world to tell the truth and no reason in the world to tell a lie.

According to appellant, the admission of the written plea agreements into evidence, in combination with this reference at closing argument (to which no objection was made at trial), impermissibly bolstered the

credibility of the witnesses whose plea agreements were introduced.[17]

In *United States v. Sims,* 719 F.2d 375, 377–78 (11th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984), we considered and rejected a similar claim. We held that the government had not improperly vouched for the veracity of a testifying co-conspirator by introducing the terms of the witness' plea agreement and referring to the agreement at closing argument. We suggested there, however, that the prosecutor had been "indiscreet" in stating in closing argument that the witness "had to testify as to the truth" because "he could still be prosecuted for perjury." *Id.* at 378. Appellants argue that while the prosecutor's brief reference to the plea agreement in his closing argument in *Sims* did not render its admission reversible error, the extended comments made by the prosecutor in this case distinguish this case from *Sims* and render the admission of the written plea agreements reversible error.

 The applicable law was well stated in *Sims:*

"Attempts to bolster a witness by vouching for his credibility are normally improper and error." *United States v. Ellis,* 547 F.2d 863, 869 (5th Cir.1977). The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. *United States v. Roberts,* 618 F.2d 530, 537 (9th Cir.1980) (citing *Ellis,* supra). This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. *See United States v.*

*Lamerson,* 457 F.2d 371, 372 (5th Cir. 1972); *Gradsky v. United States,* 373 F.2d 706, 709–10 (5th Cir.1967). Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony. *See United States v. Brooklier,* 685 F.2d 1208, 1218 (9th Cir.1982) (explaining *United States v. Roberts,* 618 F.2d 530 (9th Cir.1980)).

*Sims* 719 F.2d at 377.

Appellant Dennis argues that the "obvious implication" of the admission and subsequent use of the plea agreements at closing argument was that "the Government knew something the jury didn't, and could therefore guarantee that McClenton would not lie." Appellant appears to reach this conclusion on the basis of the provisions in the plea agreement that required the witnesses to testify truthfully in order to gain all the benefits of the plea bargains they had made. According to appellant, such an agreement suggests to the jury that the government had some independent, unstated means of verifying the truth of the witness' testimony so that the government could determine whether the terms of the agreement had been fulfilled. As a result, appellant argues, the agreements between the government and its witnesses in this case had the same effect as a personal assurance from the prosecutor indicating that he had by some non-record means ensured that the witness has testified truthfully.

 The fact that the witness had promised, as part of his plea bargain agreement, to testify truthfully was precisely what was held not to have been erroneous-

---

**17.** The government has argued that the objections to the admission of the plea agreements that were made by the defendants at trial were insufficient to apprise the trial court of the asserted ground for excluding the documents that we address in this part of our opinion. The government argues, therefore, that the improper vouching argument was not properly preserved for appellate review. *See United States v. Haynes,* 573 F.2d at 241; *United States v. Hicks,* 524 F.2d at 1004. Having examined the transcript, we are satisfied that, under the circum-

stances, the trial court was adequately informed of the grounds for excluding the documents that we consider here.

The government also argues that if the documents should not have been admitted, their admission nonetheless did not prejudice the defendants at trial, as testimony regarding the terms of the plea bargain agreements had been admitted without objection. Because we find the admission of the plea bargain agreements to have been permissible, we need not address this argument.

ly admitted in *Sims*. Under *Sims*, appellant's challenge, to the extent it is directed at the plea agreements themselves, must fail.[18] With his remarks the prosecutor in this case, as in *Sims*, added nothing significant to what was already clear from the face of the plea agreement. We are not persuaded that the prosecutor's comments in this case suggested that the government had access to some means for determining whether the witness was testifying truthfully that was not available to the jury. We thus adhere to the principle, implicit in *Sims*, that where the plea agreement is properly admitted, accurate comment thereon by the prosecutor in closing argument does not constitute reversible error.

## VI. PROPRIETY OF THE PROSECUTOR'S REBUTTAL ARGUMENT

Appellant Hurley claims that the trial court erred in refusing to declare a mistrial after the prosecutor, in his rebuttal argument, responded to a defense challenge to the character of a government witness as follows:

[Counsel for Hurley] spent a lot of time telling you how horrible a person [the witness] is compared to Brenda Hurley. Brenda Hurley is a person, though, that accepted two hundred dollars a month to let heroin and cocaine stay in the bedroom of her little girl.

Hurley characterizes this as an improper government attack on her character, which she had not placed in issue in the case. Hurley argues that because the prosecu-

tor's improper argument prejudicially affected her substantial right not to be attacked in this manner, the trial court erred in denying her timely motion for a mistrial. *See United States v. Zielie*, 734 F.2d 1447, 1460–61 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 957, 83 L.Ed.2d 969 (1985).[19]

Although we do not necessarily approve of the prosecutor's remark, it does not constitute grounds for reversal of Hurley's conviction. The prosecutor's comment, although obviously intended to reflect on the character of the defendant, was based on properly admitted evidence that was directly relevant to the determination of whether Hurley committed the conspiracy offense for which she was being tried.[20] This is not a case in which the evidentiary basis for the attack on the defendant's character was improperly admitted or was not in evidence at all. The prosecutor was fully entitled to argue the truth of the comment he made, as it was a major component of the government's case against Hurley on the conspiracy count of the indictment; his only error, if it was error, was in suggesting that the evidence reflected upon the defendant's character as well. Under such circumstances, we cannot find the prosecutor's remark, if it was improper, to have prejudiced Hurley to a degree sufficient to warrant reversal of her conviction, particularly in light of the considerable strength of the evidence against her. *See United States v. Phillips*, 664 F.2d 971, 1030–31 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

---

18. As we have held in this case, the plea agreements were not inadmissible on the grounds that they were introduced for an improper purpose. It is also clear that, the possibility of improper vouching aside, the agreements were admissible for the purpose for which they were introduced. "Where, as here, the codefendant is a witness at trial, subject to the rigors of cross-examination, disclosure of the guilty plea to blunt the impact of attacks on her credibility serves a legitimate purpose and is permissible." *United States v. Melton*, 739 F.2d 576, 579 (11th Cir.1984) (quoting *United States v. Veltre*, 591 F.2d 347, 349 (5th Cir.1979)).

19. Hurley did not object to the prosecutor's comments when they were made, but moved for

a mistrial on the grounds urged here immediately after the jury had left the courtroom to deliberate. The government argues that Hurley's objection to the prosecutor's argument, first articulated in the motion for mistrial, was not timely made. This argument is clearly without merit. *See United States v. Dorr*, 636 F.2d 117, 120 (5th Cir.1981).

20. Although Hurley claims a lack of evidentiary support for the prosecutor's assertion, it was adequately supported in the record, as the inference that the trunk kept in her daughter's room had heroin and cocaine in it could fairly be drawn from the testimony given.

## VII. THE GOVERNMENT'S USE OF ITS PEREMPTORY CHALLENGES

■ The government used peremptory challenges to strike three black males from the jury panel. In each instance, defense counsel requested that the trial court inquire into the government's reasons for striking the prospective jurors. Those requests were denied. Two blacks were eventually included on the jury that convicted the defendants. Appellants claim, however, that the record revealed no legitimate basis for excluding the three blacks who were removed from the jury panel; indeed, according to appellants, the panel members' responses at voir dire indicated that they would be less inclined than the average individual to exhibit any particular sympathy toward criminal defendants. Appellants argue that they have thus established a prima facie case in support of their claim that blacks were unconstitutionally excluded from the jury that convicted them, and that the government should now be required to provide an explanation for its use of peremptory challenges that is sufficient to rebut the presumption that the defendants' sixth amendment right to a jury drawn from a fair cross-section of the community has been violated.

Since the Supreme Court's decision in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), we have adhered to its requirement that one seeking to assert a constitutional claim on the basis of the government's use of peremptory challenges demonstrate that the prosecutor was responsible for removing blacks in "case after case" in order to make out such a claim. *Id.,* at 223–24, 85 S.Ct. at 837–38. *See Willis v. Zant,* 720 F.2d 1212, 1219 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *United States v. Durham,* 587 F.2d 799, 801 (5th Cir.1979); *United States v. Carlton,* 456 F.2d 207, 208 (5th Cir.1972). As we have noted recently, however, *see Jordan v. Lippman,* 763 F.2d 1265, 1283 (11th Cir.1985), five Justices of the Supreme Court have expressed some doubt about

the continuing vitality of *Swain, see McCray v. New York,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983) (opinion of Stevens, J., with whom Blackmun, J., and Powell, J., join, respecting the denial of the petition for writs of certiorari); *id.* at 963, 103 S.Ct. at 2439 (Marshall, J., with whom Brennan, J., joins, dissenting from the denial of certiorari), and the Second Circuit has limited *Swain*'s analysis to the equal protection context, formulating a different test for determining a similar sixth amendment challenge. *See McCray v. Abrams,* 750 F.2d 1113 (2d Cir.1984). The Supreme Court has recently granted certiorari in a case presenting this issue. *See Batson v. Kentucky, cert. granted,* — U.S. —, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985). In pressing this claim, appellants ask that we adopt the analysis set forth by the Second Circuit in *McCray.* In that case the court concluded that:

> [I]n order to establish a *prima facie* violation of his right to the possibility of a fair cross-section in the petit jury, the defendant must show that in his case, (1) the group alleged to be excluded is a cognizable group in the community, and (2) there is a substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliations rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

*McCray,* 750 F.2d at 1131. In the Second Circuit, once the defendant has established such a prima facie case, the burden shifts to the prosecutor to rebut the presumption of unconstitutional action by showing that the result was produced by permissible racially neutral selection criteria and procedures. *Id.* at 1131–32. The government argues that we should not adopt the analysis of *McCray* and that, even if we did, appellants have not made out a prima facie case in support of their constitutional claim, as two blacks were members of the jury that convicted them.[21]

---

21. The defendant in *McCray* was tried before an all white jury. *See McCray,* 750 F.2d at 1115.

We do not find the comments made by the members of the Supreme Court who wrote concerning the denial of certiorari in *McCray v. New York* sufficient to undermine the precedential authority of our prior cases, in which we have adhered strictly to *Swain* in the equal protection context and refused to apply less rigorous standards to similar claims based on the sixth amendment. *See, e.g., Willis v. Zant*, 720 F.2d at 1219.[22] A panel of this court may not disregard binding prior circuit authority in the absence of intervening Supreme Court precedent that changes the law. *See, e.g., Wilson v. Taylor*, 658 F.2d 1021, 1034 (5th Cir. Unit B 1981).[23] Thus even if we were persuaded by the arguments that have been made in support of a departure from the *Swain* analysis in this context, we could not, consistently with the law of this circuit, depart from our own prior precedent in this area.[24]

## VIII. REMAINING ISSUES

▮▮▮▮ The remainder of appellants' claims are clearly without merit and do not warrant extended discussion. The evidence was more than sufficient to convict appellant Dennis of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (1982). His sentence of thirty years imprisonment for committing that offense, for which he could have been sentenced to life imprisonment without parole, was not excessive under the eighth amendment to the Constitution. Moreover, it was not improper for the trial court to impose cumulative sentences on Dennis for the continuing criminal enterprise offense and for the predicate substantive narcotics offenses. *See United States v. Garrett*, 727 F.2d 1003, 1010 (11th Cir.1984), *aff'd*, — U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). The trial court's remark to the jury on the day the government rested its case, explaining that the court would be in recess until the following day to allow defense counsel "to get their ducks in a row and so forth," was not a constitutionally impermissible comment on any defendant's decision not to testify or present evidence, nor would it naturally and necessarily have been construed as such. *See United States v. Haynes*, 573 F.2d 236, 239 (5th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct.

**22.** The decision we reach is not inconsistent with the decision in *United States v. Hawkins*, 781 F.2d 1483, 1484–87 (11th Cir. 1986), which was published while this opinion was being prepared. In that case, too, the court did not decide "whether or under what circumstances the racially motivated use of peremptory challenges would require reversal," at 1487, recognizing that the Supreme Court has recently granted certiorari in a case raising that issue.

**23.** This circuit has adopted as precedent all decisions of Unit B of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982).

**24.** It is clear that, even if we were not bound by *Swain* and its progeny in this context, appellants could not prevail on their claim. The government utilized only three of the six peremptory challenges it was allowed during the selection of the twelve jurors who decided the case, and one of the two challenges to alternates that it was allowed. The government exercised two of the three challenges it exercised when selecting regular members of the jury to strike potential jurors who were black, and used the one challenge it chose to exercise when selecting alternate jurors to strike an alternate who was black, but eventually accepted a jury that included among its regular members two blacks. It is thus obvious that the government did not attempt to exclude all blacks, or as many blacks as it could, from appellants' trial jury. Moreover, the unchallenged presence of two blacks on the jury tends to rebut any presumption of racial discrimination that might be argued to arise from the prosecutor's use of three of the four peremptory challenges he exercised to remove blacks from the panel of potential jurors and alternates. The fact that one of the three blacks who were challenged and the mother of another had been victimized by burglars in the past in no way suggests that the prosecutor's challenges to those jurors were based on their race. We thus conclude that, although we cannot know with absolute certainty whether the prosecutor was influenced in his exercise of peremptory challenges by racial criteria, appellants have not demonstrated a substantial likelihood that the government exercised its peremptory challenges in a manner that was designed to dilute the representation of blacks on the trial jury. Thus we would find that appellants have not made out a prima facie case of racial discrimination in the government's use of its peremptory challenges even if we were not foreclosed from considering such a claim by *Swain* and other precedent that is binding upon this panel.

154, 58 L.Ed.2d 153 (1978). Finally, the court did not abuse its discretion when, having just continued the trial for one week, it denied appellant Cohen's motion for an indefinite continuance to allow her further time to prepare for trial.

### CONCLUSION

For the reasons set forth above, the judgment appealed from is AFFIRMED in its entirety.