**UNITED STATES of America,**

v.

**Lorenzo ALLEN, a/k/a Ren, Francis Sylvester Lindsey, and Roger Lee Harrell, a/k/a Dubuck.**

**No. CR. 85–36–N.**

United States District Court,
E.D. Virginia, Norfolk Division.

July 27, 1987.

As Modified July 30, 1987.

James A. Metcalfe, Asst. U.S. Atty., Norfolk, Va., for plaintiff.

John W. Eppler, Norfolk, Va., Chris A. Christie, Paul H. Ray, Virginia Beach, Va., for defendants.

## MEMORANDUM OPINION

WALTER E. HOFFMAN, Senior District Judge.

### Procedural History of the Case

The defendants in this case were tried by jury beginning May 16, 1985, and were convicted of armed bank robbery (18 U.S.C. §§ 2113(a), (d)) and conspiracy (18 U.S.C. § 371) by verdicts returned May 20, 1985. The Fourth Circuit affirmed the convictions. *United States v. Allen,* 787 F.2d 933 (4th Cir.1986). This court denied the defendants' petition for rehearing on June 13, 1986, after considering the parties' briefs on the retroactive effect of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The defendants subsequently petitioned the Supreme Court for a writ of *certiorari.* Thereafter the Supreme Court held in *Griffith v. Kentucky,* — U.S. —, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), that *Batson* should be applied retroactively to all cases pending on direct review. In accordance with *Griffith,* the Supreme Court granted *certiorari* in the present case, vacated the judgment, and remanded the case. *Allen v. United States,* — U.S. —, 107 S.Ct. 1271, 94 L.Ed.2d 132 (1987). The Fourth Circuit in turn remanded the case to this court to determine whether the circumstances surrounding the prosecutor's use of peremptory challenges in the trial had created a *prima facie* case of discrimination against black jurors. *United States v. Allen,* 814 F.2d 977 (4th Cir.1987). On May 26, 1987, this court conducted an evidentiary hearing in order to determine whether the defendants had established a *prima facie* case of purposeful discrimination. Subsequent to ruling that defendants had established a *prima facie* case, the court set a briefing schedule, received briefs, and on July 2, 1987, heard arguments on the government's rebuttal to defendants' claim that the prosecutor's exercise of peremptory challenges was racially motivated. These procedures are in accord with the instructions given by the Fourth Circuit in *United States v. Henry Hamilton, Jr.,* 819 F.2d 71 (4th Cir.1987).

### Facts Regarding Jury Selection

During the May 26, 1987, evidentiary hearing, this court received into evidence as Court Exhibit 1 a statement dated May 19, 1987, of the prosecutor, J. Phillip Krajewski, regarding how the strikes occurred during the jury selection and a copy of 29 juror qualification statements, which indicate each juror's race. As Court Exhibit 2, the court received as evidence seven extra qualification statements of the white jurors who were excused.

The official file of this case also contains Juror Information Forms (AO–229) which the jurors filled out at the time they were summoned. (Court Exhibit 3). These forms do not indicate the jurors' race.

Counsel for all three defendants stipulated that the evidence before the court accurately reflects the manner in which the strikes had occurred on May 16, 1986. Nothing in the original trial record contradicts evidence presented at the May 26, 1987, hearing.

As is the customary procedure of this court, the *voir dire* was conducted by the presiding judge and incorporated questions submitted in advance by both the prosecutor and counsel for the defendants. There is no suggestion by the defense counsel that the *voir dire* was improperly conducted or that any suggestion of racial discrimination occurred therein.

. Also following the standard procedure of this court, the trial judge announced that for the selection of the twelve jurors the United States was allowed six peremptory challenges and the defendants were allowed ten peremptory challenges to be exercised collectively among the three defendants. No back striking was allowed. *Id. est,* once counsel exercised strikes against a given panel, counsel indicated their satisfaction, and the clerk called other potential jurors to replace those stricken, counsel could not subsequently exercise strikes against those jurors called originally and not stricken. Each side was allowed one additional peremptory challenge when an alternate juror was selected from three names drawn after the panel of twelve jurors had been selected.

After the challenges for cause were ruled upon, the first group of twelve jurors was called. The government began the selection process by exercising one challenge, and the defendants exercised two challenges. This alternating pattern was repeated three times with the first panel, resulting in the following selections and strikes:

| Name | Race | Striking Party |
| --- | --- | --- |
| Alease L. Hodges | Black | Government |
| William L. James | White | |
| Peggy Zinkle [1] | White | Defendants |
| Roberta B. Wright | Black | Government |

| Name | Race | Striking Party |
| --- | --- | --- |
| Thomas J. Bradley | American Indian | |
| James F. Barber | White | Defendants |
| Timothy J. Hatton | White | |
| William H. Bowser | Black | |
| Eugene C. Davenport | White | |
| Ruby W. Rile | Black | Government |
| Veronica F. Young | White | Defendants |
| Margaret J. Patterson | Black | |

The Clerk then called six additional names, and the peremptory challenges continued according to the established procedure, with these results:

| | | |
| --- | --- | --- |
| Johnny E. Worsley | Black | |
| Flora M. Boykins | Black | Government |
| Valetta S. Shore | White | Defendants |
| Deborah M. Brunick | White | Defendants |
| Barbara E. Smith | Black | Government |
| Calvin B. Sanders | White | Defendants |

At this point the clerk called five more names. Counsel exercised peremptory challenges, resulting in the following selections and strikes:

| | | |
| --- | --- | --- |
| Laurie M. Weymouth | White | |
| William C. Cox | White | Defendants |
| Eileen B. McSweeney | White | |
| Robin A. Jenkins | White | |
| Stephen W. Jones | White | Defendants |

Next the clerk called two more names, and the defendants exercised one strike with this result:

| | | |
| --- | --- | --- |
| Paulette E. Mathews | White | |
| Constance Marshall | White | Defendants |

At this time the clerk called one more name. Neither party exercised a peremptory challenge; therefore, the panel of twelve jurors was completed as follows:

---

**1.** Peggy M. Zinkle signed "Peggy M. Zinkle" on her questionnaire which was derived from the jury master wheel based upon her prior voter registration name of Peggy A. Miller. This name change is noted by her on the reverse side of her questionnaire.

| Name | Race | Striking Party |
|------|------|----------------|
| Milan W. Kitchen | White | |

The clerk called three names for alternate jurors. The government exercised its strike first, followed by the defendants' counsel, with these results:

| Marie M. Brown | White | Government |
|----------------|-------|------------|
| Lewis J. Lowe | Black | Defendants |
| John J. Skura[2] | White | |

Of the 36 jurors in the venire on May 16, 1986, the juror qualification questionnaires which are a part of the record show that nine were black, one was an American Indian, and 26 were white. Of the twelve jurors actually selected, three were black, one was an American Indian, and eight were white. Thus the percentage of black jurors impaneled is identical to the percentage of black jurors in the venire. At the completion of the selection of the original panel of twelve, the clerk drew Lewis J. Lowe's name as a potential alternate juror. Lowe was the last black person in the venire. The government exercised the first strike from the three potential alternate jurors, striking a white woman and leaving Lowe. The defendants exercised their final strike against Lowe. Previously the defendants had objected to Lowe for cause; the court denied their objection for cause. Lowe's son-in-law was an FBI agent, and Lowe had an account at the bank which was robbed.

After the jurors had been selected and had retired to the jury room, defense counsel objected to the government's exercise of its peremptory challenges because the government had stricken five black jurors. Based upon the law in effect at the time of trial, the court overruled the defendants' objections because there was no showing that the peremptory challenge system as a whole was being perverted. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *United States v. Whitfield*, 715 F.2d 145 (4th Cir.1983). Of course, those cases have been overruled by

*Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Consequently, this court shall now reexamine the facts available from the trial record and those facts admitted at the evidentiary hearing and at later oral arguments in order to determine whether the government has come forward with rebuttal evidence sufficient to overcome the *prima facie* case of intentional discrimination against black jurors established by the defendants at the evidentiary hearing on May 26, 1987.

## DISCUSSION

### The Batson Standard

Following one of the illustrative examples of *Batson*, the court issued, on May 26, 1987, a bench ruling on the issue of the prosecutor's having challenged five consecutive black jurors and whether this fact gave rise to an inference of discrimination. The court found that the defendants had established a *prima facie* case of intentional discrimination against black jurors. Once the defendants have made a *prima facie* showing, the burden shifts to the government to come forward with a neutral explanation for challenging black jurors. *Batson*, 106 S.Ct. at 1723. Recognizing that its requirement may in some cases impose a limitation on character of the peremptory challenge, the Supreme Court then emphasized that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. *Batson*, 106 S.Ct. at 1723. The Court further instructed that the prosecutor may not rebut the defendants' *prima facie* case of discrimination "by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Batson*, 106 S.Ct. at 1723. Additionally, the Court advised that the prosecutor may not rebut the *prima facie* case merely by denying that he had a discriminatory motive or by affirming his own good faith. *Batson*, 106 S.Ct. at 1723, *citing Alexan-*

---

**2.** John J. Skura, the alternate juror, was excused prior to jury deliberation and was not one of the twelve jurors returning the verdict in this case.

der v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). General assertions from the prosecutor are not acceptable as rebuttal evidence because to accord such weight to the government's statements would render the Equal Protection Clause "a vain and illusory requirement" since the Equal Protection Clause guarantees the defendants that the government will not exclude members of their race from the jury venire on account of race. Norris v. Alabama, 294 U.S. 587, 598, 55 S.Ct. 579, 583, 79 L.Ed. 1074 (1935).

Having discounted the kinds of prosecutorial statements which will not serve to rebut the defendants' prima facie case, the Court in Batson then described the rebuttal obligation placed upon the government. The prosecutor must articulate a neutral explanation related to the particular case under consideration. Quoting McCray v. Abrams, 750 F.2d 1113 (2nd Cir.1984), judgment vacated, — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), the Court noted, " '[t]here are any number of bases on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause.' " Batson, 106 S.Ct. 1723–1724, n. 20. In the same footnote the Court affirmed the applicability of a previous decision to the burden placed upon the prosecutor in this context. The prosecutor must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. Batson, 106 S.Ct. 1724, citing and quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Court also pointed out that the trial judge's factual findings regarding the prosecutor's explanation and rationale will turn on an evaluation of credibility. Batson, 106 S.Ct. 1724, n. 21. With this instruction, the court will now evaluate the evidence before it and the credibility of the witnesses in the light of the Batson standards previously discussed.

**The Applicability of Batson to the Case Sub Judice**

At the evidentiary hearing conducted on May 26, 1987, the government prosecutor, J. Phillip Krajewski, testified regarding his rationale in selecting a jury for the trial of three accused bank robbers: Lorenzo Allen, Francis Sylvester Lindsey, and Roger Lee Harrell. Mr. Krajewski stated, "Well, we wanted to get an intelligent and reliable jury, responsible jury, and looked basically at the educational level of the jurors and their employment or lack thereof. In addition to that [we] looked at the juror, each individual juror's demeanor, appearance and behavior." (Excerpts 9). When asked what he had available to him to aid in jury selection in addition to what occurred in open court, Mr. Krajewski testified that his secretary had garnered information from the juror cards, the questionnaire, and the information sheet. Mr. Krajewski had with him the information thus prepared. He stated that the sheet contained the name, age, race, employment, educational level, and city of residence of each juror. (Excerpts 9–10). Mr. Krajewski added that he had consulted with one defense attorney, Mr. John Eppler, in order to reconstruct how the strikes occurred. Mr. Krajewski admitted that he could neither recollect nor reconstruct the actual physical appearances of the jurors. (Excerpts 12). Over two years had elapsed in the meantime.

When questioned about the specific jurors which he struck, Mr. Krajewski provided the following information and explanations. In regard to Alease Hodges, a black juror, the prosecutor stated that according to court records, Hodges did not graduate from high school, having completed only nine years of schooling. This juror was a housewife not employed outside the home at that time. (Excerpts 12). The black juror Roberta Wright had an educational and employment record almost identical to that of Hodges: an unemployed person with nine years of education. (Excerpts 13). The juror information form indicates that Wright was retired.

A third black woman, Ruby Rile, was also stricken by Mr. Krajewski. At the evidentiary hearing, the prosecutor recalled that Rile appeared to be inattentive. Mr. Krajewski opined that Rile was not going to be able to follow the case. At the time of jury selection, Rile was 74 years old.

The records available to the prosecutor indicated that Rile was a day worker. (Excerpts 13).

In regard to the last two jurors which Mr. Krajewski struck, the prosecutor testified and the records show that neither was a high school graduate. Flora Boykins' educational level was a factor which the prosecutor considered. (Excerpts 14). Barbara Smith was also not a high school graduate, and she was unemployed at the time of jury selection. Mr. Krajewski's notes from the jury selection procedure indicate that he had written "no" adjacent to the name Barbara Smith. The prosecutor testified that his written response indicated that some facet of her appearance or behavior made him decide not to select her as a member of the jury panel.

When asked to compare the education levels and employment records of those jurors who were selected with those who were not, Mr. Krajewski came forward with the following information about the impaneled jurors:

| Name | Years of Education | Employment |
| --- | --- | --- |
| William James | eight years | employed |
| William H. Bowser | nine years | employed |
| Thomas Bradley | high school plus two years [3] | employed |
| Timothy Hatton | high school plus six years [4] | employed |
| Eugene Davenport | high school | employed |
| Margaret Patterson | high school plus three years | employed |
| Johnny Worsley | high school plus four years | employed |
| Laurie Weymouth | high school plus six years | unknown |
| Eileen McSweeney | high school | retired |
| Robin Jenkins | high school plus two years | employed |
| Paulette E. Matthews | high school plus one year | employed |
| Milan Kitchens | high school | employed |

Thus the evidence reproduced herein does indicate that the impaneled jurors were all high school graduates with the exception of Messrs. James and Bowser, who were, however, employed. Government Exhibit 1 shows that Hodges was a

housewife and that Rile, Smith, and Wright were unemployed. Hodges indicated that she was a housewife on AO–229 and left the space blank on the juror qualification questionnaire. Rile indicated that she did day work on both forms. Smith left the space blank on the AO–229 and indicated that she was a self-employed seamstress on the other questionnaire. On the AO–229 Wright wrote that she was a salad supervisor; on the questionnaire she indicated her retirement, even though the questionnaire pre-dates the AO–229. Flora Boykins held some sort of supervisory position at Medical Center Hospital, the location of which institution is unknown. Her tenth grade education gives rise to the inference that she was not supervising medical personnel. (Excerpts 18–20). However, in evaluating Mr. Krajewski's credibility, the court will consider the prosecutor's beliefs and his rationale based thereon on May 16, 1985, not what the government may have ascertained in 1987.

Mr. Eppler, a defense attorney, cross-examined Mr. Krajewski rather extensively in regard to his intent as to striking various jurors. The prosecutor's consideration of housewives as unemployed persons and of elderly persons as unemployed came under scrutiny. The court accepts Mr. Krajewski's explanation that in general he accepted as true the information which either he or his staff derived from the forms which the jurors themselves completed. The court accepts as reasonable the prosecutor's desire to impanel jurors with the soundest educational and employment records possible. Presumably, the prosecutor wished to find jurors who were likely to place a high value on keeping secure a bank account, given the nature of the offense charged. While housewives may or may not be employed in a literal sense and may or may not have bank accounts, the court finds no fault with the prosecutor's rationale in this regard and finds that the prosecutor provided a racially neutral reason for striking three unemployed jurors.

---

**3.** Mr. Krajewski testified that he later came to believe that Thomas Bradley had high school plus four years.

**4.** Mr. Krajewski testified that he later came to believe that Timothy W. Hatten had high school plus four years.

In addition to Mr. Krajewski's explanation for his peremptory challenges made because of lack of employment, the court also has considered evidence on the prosecutor's factoring each potential juror's countenance and mein into his decision whether or not to strike. Mr. Krajewski candidly admitted that two years subsequent to the actual juror selection he had no recollection of the specific appearance and behavior of any of the jurors except for Ruby Rile. In deciding that there would be no retroactive application of the *Batson* rule on collateral review of final convictions, (a holding inapplicable generally to this case which has been considered on direct review) the Supreme Court has nonetheless provided an apt description of Mr. Krajewski's precise problem in explaining why he struck jurors because of their appearance.

> Retroactive application would require trial courts to hold hearings, often years after the conviction became final, to determine whether the defendant's proof concerning the prosecutor's exercise of challenges established a prima facie case of discrimination. Where a defendant made out a prima facie case, the court then would be required to ask the prosecutor to explain his reasons for the challenges, a task that would be impossible in virtually every case since the prosecutor relying on *Swain* would have had no reason to think such an explanation would someday be necessary.

*Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 2881, 92 L.Ed.2d 199 (1986).

■ That any person should be asked to recall specific details of the appearance and behavior of a group of 36 potential jurors seen only briefly two years earlier would be to require superhuman capacity for recollection of minutiae. Using his trial notes to refresh his recollection, the prosecutor could recall that Ruby Rile was inattentive. Additionally, Mr. Krajewski testified that his handwritten "no" beside Barbara Smith's name meant, "... there was something I observed about her, some very specific observation which I cannot recall at this time." (Excerpts 14). In reliance on *Swain* and *Whitfield*[5] the prosecutor had no reason in May 1985 to think that he had to record or document the selection process. Most certainly it was in reliance on *Swain* and *Whitfield* that this court overruled the defense counsel's objection to the exercise of the government's peremptory challenges in the first place. Therefore, the court finds that the prosecutor gave a credible explanation, to the best of his recollection, of the extent to which his strikes were based upon his perception of jurors' appearance and behavior. The Fifth Circuit has held that a prosecutor's intuitive assessment regarding posture and demeanor of a juror was racially neutral because the record did not remotely suggest that the prosecutor's action was based upon race. *United States v. Forbes,* 816 F.2d 1006, 1010–11 (5th Cir.1987). In the present case, the court finds no evidence either in the record or from the evidentiary hearing that Mr. Krajewski's intuitive reactions to jurors' appearance and behavior were racially motivated.

■ Having examined the specific reasons which the prosecutor gave for striking each of the five black jurors and having found the explanations racially neutral, the court now turns its attention to the totality of the circumstances regarding the jury selection process and the ultimate jury composition. In the evidentiary hearing, the defendants put on no evidence to support their position that the government's strikes were racially motivated. Likewise the trial record reflects no such racial motivation. The court found a *prima facie* case of intentional discrimination at the conclusion of the evidentiary hearing based upon the uncontroverted facts that the prosecutor struck five black jurors and that all three defendants were black. In this

---

**5.** Jury selection took place on May 16, 1985, when the law governing the process was set forth in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and in *United States v. Whitfield,* 715 F.2d 145 (4th Cir.1983).

At that time the law in this circuit was well settled: the constitution did not require an examination of the prosecutor's reasons for the exercise of peremptory challenges.

case, the government accepted three black jurors (William Bowser, Margaret Patterson, and Johnny Worsley), and one black alternate; the alternate, Louis Lowe, was subsequently stricken by the defendants. The prosecutor also left a racially cognizable minority member, Thomas J. Bradley, an American Indian. The court also recognizes that Mr. Krajewski did not exercise one of his six strikes. Had Mr. Krajewski been determined to remove all minority members from the jury, he could have exercised all of his strikes early-on toward that end. Without allowing the analysis to continue to the extent that this court has, the Eleventh Circuit has held that a prosecutor's using three of the four peremptory challenges that he exercised to strike black jurors did not establish a *prima facie* case of discrimination. *United States v. Dennis*, 786 F.2d 1029, 1048–49 (11th Cir.1986). Although the holdings of *Dennis* are not binding upon this court, the facts of that case are quite similar to the one under consideration. This court finds persuasive the fact that the prosecutor left on the jury panel three black persons. Of those three, two had three and four years, respectively, of education beyond high school. The third black juror had nine years of education; however, this juror was gainfully employed at Norshipco. The three impaneled black jurors met some or all of the qualifications which Mr. Krajewski established in his rationale for selecting jurors. In a similar situation, the Ninth Circuit held that the striking of two black jurors did not constitute a systematic exclusion of blacks since the prosecutor expressed a neutral, reasonable basis for challenging the black jurors. *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.1987). In *Vaccaro*, the prosecutor struck two black jurors, one of whom had a brother who was in prison for a robbery conviction and the other who displayed a bad attitude during *voir dire*. A reasonable conclusion, considering all of the facts and circumstances surrounding the jury selection process in this case, is that Mr. Krajewski applied the racially-neutral criteria of education, employment, and demeanor to *all* jurors, whether black, white, or American Indian.

In the evidentiary hearing the government enumerated a series of factors relevant to those cases in which intentional discrimination against black jurors has been charged. In the first scenario, all members of the defendant's minority were excluded from the jury. *United States v. Chalan*, 812 F.2d 1302 (10th Cir.1987) (all American Indians excluded); *United States v. Erwin*, 793 F.2d 656 (5th Cir.1986) (a black defendant with an all-white jury). Such a situation did not exist in this case; the jury panel contained three black jurors. A second factor involves an impaneled jury which does not reflect a representative cross-section of either the entire venire or the community at large. *United States v. Woods*, 812 F.2d 1483 (4th Cir.1987) (court found racial composition of jury reflected that of community). In the present case, the composition of the petit jury was 25 percent black (three of twelve jurors). Nine of the original 36 venire were black, also 25 percent. According to the *Statistical Abstract of the United States* (1987), U.S. Department of Commerce, Bureau of the Census, page 29, the metropolitan statistical area of Norfolk, Virginia Beach, and Newport News, Virginia has a black population of 28 percent. Although jurors for the U.S. District Court for the Eastern District of Virginia, Norfolk Division, are not drawn from that identical area, the available data do establish that the venire did reflect a cross-section of the population of this general geographic area.

A third factor for consideration in cases such as the present is whether the defendant's race is different from that of the victim. *People v. Hall*, 35 Cal.3d 161, 197 Cal.Rptr. 71, 672 P.2d 854 (1983) (black defendant, white victim). In the present case the three black defendants were accused of robbing the black manager of a bank. Another factor enumerated by the government involves an inadequate effort on the part of the prosecutor to explain his peremptory challenges. *People v. Turner*, 42 Cal.3d 711, 230 Cal.Rptr. 656, 726 P.2d 102 (1986) ("it was something in her work"). In contrast, Mr. Krajewski offered a thorough explanation of his ratio-

nale plus as complete a perception of the jurors' demeanors as he was able to reconstruct after two years.

Another situation which gave rise to an objection to the prosecutor's use of peremptory challenge came about after an initial trial ended in a hung jury. The record showed that either two or three of the jurors who voted to acquit were black. On retrial, the defense moved for a mistrial after the prosecutor challenged seven black and one Hispanic veniremen. *McCray v. Abrams*, 750 F.2d 1113, 1115 (2nd Cir. 1984). The present case is clearly distinguishable on its procedural history and facts from *McCray*, there having been no prior trial.

Finally, *Batson* teaches that the prosecutor's questions and statements during *voir dire* examination and in exercising his challenge may support or refute an inference of discriminatory purpose. *Batson v. Kentucky*, 476 U.S. at ——, 106 S.Ct. at 1723. During the evidentiary hearing on this matter, the assistant to the prosecutor, Timothy G. Clancy, who was a third-year law student at the time of the trial, testified that during the entire jury selection process he could recall no time when Mr. Krajewski commented upon the jurors' race. When the defense counsel, Mr. Ray, objected to the prosecutor's having struck blacks, Mr. Krajewski turned to Mr. Clancy to ask if in fact he had stricken all blacks. (Excerpts 52). Additionally it is relevant to note that in this court the *voir dire* is conducted entirely by the judge, with the attorney asking no questions of jurors. Consequently, cases dealing with counsel asking fewer or no questions to black jurors are irrelevant to this consideration. Also, there have been no complaints that the trial judge did not ask pertinent questions which might have disclosed jurors' racial prejudice. *See United States v. Erwin*, 793 F.2d 656 (5th Cir.1986).

As a result of a careful analysis of the trial record, the material brought to light at the evidentiary hearing, and the case law cited herein, the court finds that the government has successfully rebutted the *prima facie* case of intentional discrimination against black jurors which the court found at the conclusion of the July 2, 1987, evidentiary hearing. The defendants' motion for a new trial is therefore denied.

**Timeliness**

Writing for the Court in *Batson*, Justice Powell specifically declined to formulate particular procedures to be followed upon a defendant's timely objection to prosecutorial challenges. *Batson v. Kentucky*, 476 U.S. at ——, 106 S.Ct. at 1724. The Court expressed no opinion as to whether the trial court, upon a finding of intentional discrimination, should discharge the venire and select a new jury from a panel not previously associated with the case as was done in *Booker v. Jabe*, 775 F.2d 762 (6th Cir.1985). Similarly, the Court stated no view on the practice of disallowing the discriminatory challenges and resuming selection with the improperly challenged jurors reinstated on the venire as was done in *United States v. Robinson*, 421 F.Supp. 467, 474 (Conn.1976), *mandamus granted sub nom. United States v. Newman*, 549 F.2d 240 (2nd Cir.1977).

Certainly this court recognizes the importance of the orderly and efficient administration of justice but acknowledges the court's primary responsibility of assuring individuals their rights to a properly selected jury, based upon the *Batson* standards. In dissenting in *Batson*, Chief Justice Rehnquist, joined by former Chief Justice Berger, wrote:

The Court does not tarry long over any of these difficult, sensitive problems, preferring instead to gloss over them as swiftly as it slides over centuries of history: "[W]e make no attempt to instruct [trial] courts on how best to implement our holding today." Ante [476 U.S. at ——, 106 S.Ct.], at 1724, n. 24, 90 L.Ed.2d 90. that leaves roughly 7000 general jurisdiction state trial judges and approximately 500 federal trial judges at large to find their way through the morass the Court creates today. The Court essentially wishes these judges well as they begin the difficult enterprise of sorting out the implications of the Court's newly created "right." I join my

colleagues in wishing the nation's judges well as they struggle to grasp how to implement today's holding.

*Batson v. Kentucky,* 476 U.S. at ——, 106 S.Ct. at 1741.

■ Implementing the *Batson* standards is indeed a challenge, particularly when the court must rely on records and memories of events which occurred two years ago at a time when all parties were correct in relying on different case law. At the May 26, 1987, evidentiary hearing, this court called upon defense counsel to comment upon the timeliness of their challenges, coming as it did after all jurors and alternates were selected but before the jury was sworn. Receiving no law in point at either the evidentiary hearing or at the arguments which followed on July 2, 1987, the court has reviewed the law of this and other circuits in order to ascertain whether Mr. Ray's motion was timely made. *United States v. Erwin,* 793 F.2d 656, 667 (5th Cir.1986), contains similar but not identical circumstances. The court in *Erwin* called the challenge untimely, noting, given "the eleventh-hour nature of their motion, *Batson* does not provide them with a ground for reversal or remand." *Erwin,* 793 F.2d at 667. In *Erwin,* as in the present case, although the jury was not yet impaneled, the trial was about to begin and all of the unselected veniremen had been released. *Erwin* can be distinguished from this case because, for reasons not explained, the defendants waited a full week before moving to strike the panel. Here, Mr. Ray moved immediately after the alternate juror was selected. Reluctantly, this court finds that the defendants' motion was timely. In fairness, neither the defense nor the prosecution was guided by *Batson* when the events occurred.

■ However, to guide future defense counsel in making timely objections to possible intentional discrimination against black jurors, this court recommends action such as that described in *People v. Hall,* 35 Cal.3d 161, 197 Cal.Rptr. 71, 672 P.2d 854 (1983).

... the prosecutor used peremptory challenges to excuse at least four black prospective jurors. After the prosecutor had excused two blacks with his first three peremptory challenges, defendant asked that the People be required to make a showing that no systematic exclusion of blacks was underway if any further peremptory challenges were used to exclude black prospective jurors.

*Hall,* 197 Cal.Rptr. at 73, 672 P.2d at 855.

If challenges are made early-on, the prosecutor is on notice that he will have to present his rationale for striking additional black jurors. The court's attention can be focused on the percentage of blacks among the veniremen. The defense can petition the court to have any black jurors inappropriately stricken be returned to the venire. In all, the jury selection process can continue smoothly, with the court ruling on objections as they arise. In this and most other jurisdictions, jury costs have risen, and it is impractical to have a venire of 36 to 50 persons called and paid only to have them excused, and a new venire called, just because the defense counsel has not made a timely objection. With all persons vigilant and ready to follow the dictates of *Batson* so long as it is the law of the Supreme Court and thus binding upon all other courts, unnecessary expenses and travail in calling extra veniremen can surely be avoided. Therefore, this court urges that all *Batson*-type objections be made in a timely manner.

MOTION FOR NEW TRIAL DENIED.