**UNITED STATES of America**

v.

**CLEMMONS, Ralph, Appellant.**

**No. 88–3656.**

United States Court of Appeals,
Third Circuit.

Argued March 1, 1989.

Decided Dec. 28, 1989.

As Amended Feb. 6, 1990.
Rehearing and Rehearing En Banc
Denied Feb. 8, 1990.

George E. Schumacher and Thomas S. White (argued), Federal Public Defenders, Pittsburgh, Pa., for appellant.

J. Alan Johnson, U.S. Atty. and Constance M. Bowden (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

Before HIGGINBOTHAM, STAPLETON, and COWEN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Ralph Clemmons raises four issues on appeal from his conviction for selling stolen United States Treasury Bonds in violation of 18 U.S.C. § 510(b): (1) whether the prosecutor's peremptory challenge of a purportedly black venireman violated Clemmons' equal protection rights as interpreted in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (2) whether this peremptory challenge violated Clemmons' Sixth Amendment right to a jury drawn from a "fair cross-section of the community"; (3) whether his indictment failed to address a necessary element of the offense charged and was therefore defective under Federal Rule of Criminal Procedure 7 and the Fifth Amendment; and (4) whether the evidence that he knew the bonds at issue were stolen was sufficient to support the jury's guilty verdict. We have jurisdiction under 28 U.S.C. § 1291 and consider each issue in turn.

## I.

## A.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court adopted a new test for determining when a prosecutor violates a criminal defendant's equal protection rights by exercising peremptory challenges against prospective jurors on the basis of race or other cognizable group status. More than twenty years earlier, the Court had declared in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that discriminatory peremptory strikes violate the Fourteenth Amendment.[1] But experience had proved that *Swain* saddled defendants with too onerous a burden of proof and, consequently, that the rights declared in that decision were rarely vindicated.[2] In *Batson,* therefore, the Court tailored a new test under which defendants can more effectively protect themselves against the discriminatory use of peremptory challenges.

██ *Batson's* new test consists of two steps. The defendant must first make a prima facie case supporting an inference that the prosecutor challenged prospective jurors on account of their race. To make such a case, the defendant must demonstrate that he and the prospective juror are members of the same "cognizable group." 476 U.S. at 82, 96, 106 S.Ct. at 1714, 1722. Additionally, the defendant must point to circumstances surrounding the peremptory challenges—including any unusual pattern of strikes or other suggestive comments or acts by prosecutors—that "give rise to an inference of discrimination." *Id.* at 96–97, 106 S.Ct. at 1722–23. The Court expressly left to the trial judges the task of determining when the circumstances justify that inference. *Id.* at 97, 106 S.Ct. at 1723.

If the defendant makes a prima facie showing of discrimination, the burden shifts to the prosecutor to articulate a neutral, non-discriminatory explanation for the troubling strike or strikes. Though the prosecutor's explanation must be "clear and reasonably specific," *id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20, it "need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. at 1723. The trial judge must then decide whether the defendant has proved that the prosecutor struck the prospective jurors because of their race or cognizable group status. Because this determination is factual and turns largely on an assessment of credibility, the Court instructed that the finding of the trial court merits great deference on review. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21.

Clemmons' *Batson* claim centers on the prosecutor's peremptory challenge to venireman Balhadra Das. When the prosecutor moved to strike Das, Clemmons' attorney objected:

> Your Honor, I ask the record show my client ... is a black man, and the only black man within the first 28 jurors on this jury has not been chosen. The government has stricken that man from the jury, and under ... *Patton v. Kentucky* [sic] I believe I have a valid objection and ask the Court to require the Government to state its reasons for striking this man from the jury. Otherwise, we deprive this man from being an im-

---

1. Because *Swain* and *Batson* involved challenges to discriminatory peremptory strikes by state prosecutors, the defendants in those cases claimed a violation of the Equal Protection Clause of the Fourteenth Amendment. Since Clemmons alleges discrimination by a federal prosecutor, however, he necessarily styles his claim as a violation of the implicit equal protection component of the Fifth Amendment. *See United States v. Frame,* 885 F.2d 1119, 1137 (3d Cir.1989) ("The Fifth Amendment contains an implicit equal protection component that prohibits the federal government from discriminating between individuals or groups.").

2. *Swain* held that a defendant may raise an inference of intentional discrimination by demonstrating that "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, [the prosecutor] is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, *with the result that no negroes ever served on petit juries.*" 380 U.S. at 223, 85 S.Ct. at 837 (emphasis added).

partial juror under this case and deny his rights to the Sixth Amendment.

Appendix for Appellant ("App.") at 57. The district court, without expressly finding that the defendant had tendered a prima facie case, asked the prosecutor to justify the challenge to Das. The prosecutor responded that he believed that Das was of Asian–Indian descent, not black, and that Das was "probably Hindu in religion. . . ." App. at 57. "Hindus tend . . . to have feelings a good bit different from ours about all sorts of things" the prosecutor explained, and he struck Das because he "may have religious beliefs that may affect his thinking." *Id.* The district court agreed that Das did not appear to be black and accepted the prosecutor's explanation that he struck Das because of uncertainty about his religious views and not on racial grounds.

We cannot discern from the record whether the district court actually decided that Clemmons made a prima facie showing before it demanded the prosecutor's explanation. There is reason, however, to believe that it did not. As noted above, the record contains no such express finding. Clemmons simply raised the *Batson* objection, claiming that Das was the first black venireman to be considered for the petit jury, and the court then asked the prosecutor to justify the challenge. Moreover, it is not clear that the situation supported an inference of intentional racial discrimination. The prosecutor did not challenge any other blacks and said nothing else that raises an inference of discrimination. Though no blacks sat on the petit jury as eventually constituted, one of the alternate jurors was black. Most notably, though *Batson* specifies that only challenges to prospective jurors of the same cognizable group as the defendant satisfy the prima facie burden, the district court required the prosecutor to explain his challenge despite the fact that it did not believe that Das, unlike the defendant, was black.

■ Nevertheless, we agree with Clemmons that we should assume that he made out his prima facie case. Though Das did not appear black to the district court judge, the record indicates that the court explicitly prohibited defense counsel from questioning Das about his race. App. at 57. Because the court cut off that inquiry, we feel bound to assume that Das is black, thus eliminating one of the bases for rejecting Clemmons' prima facie claim. In addition, independent of the strength of the evidence tendered as a prima facie case, once a prosecutor attempts to explain a peremptory challenge, we believe the trial and reviewing courts should look to the entire record to determine if intentional discrimination is present. If the prosecutor's explanation raises more concern than it puts to rest, courts cannot effectively close their eyes to that fact by simply deciding that the defendant has not made out a prima facie case. While we thus assume, without deciding, that Clemmons made out a prima facie case of racial discrimination, we do not thereby suggest that it is desirable for trial courts to turn immediately to the second step of the *Batson* test. The *Batson* Court contemplated that the traditional peremptory challenge process would not be intruded upon absent some reason to believe that discrimination might be at work. *See* 476 U.S. at 99 n. 22, 106 S.Ct. at 1724 n. 22. Accordingly, district courts should expressly address the prima facie issue before requiring an explanation from the prosecutor.[3]

---

**3.** Our decision in *United States v. Clemons,* 843 F.2d 741 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988), an unrelated case, provides a framework for these determinations:

> When assessing the existence of a prima facie case, trial judges should examine all relevant factors, such as: how many members of the "cognizable racial group" (in this case, blacks) are in the panel; the nature of the crime; and the race of the defendant and the victim. *See generally United States v. Allen,* 666 F.Supp.

847, 854 (E.D.Va.1987) (outlining possible factors relevant to a *Batson prima facie* case inquiry). In addition, *Batson* itself lists two "illustrative" examples of relevant factors: (1) a pattern of strikes against black jurors in a particular venire; and (2) prosecutor's questions and statements during the selection process. Like the Supreme Court['s], our reference to certain factors is intended to assist trial courts in focusing their inquiry. Our discussion should not be construed as barring trial judges from addressing other facts and

Assuming, therefore, that Das is black and that Clemmons raised an inference of discrimination, we turn to whether the district court committed clear error in finding that the prosecutor did not strike Das because he was black. As we have noted, the district court had before it the prosecutor's representation that he did not strike Das because of his race but rather because of uncertainty about his religious beliefs. In addition, by way of support for this racially neutral explanation, the court had the facts that (1) Das did not *appear* to the court to be black and did *appear* to the court to be Asian–Indian, (2) Das' appearance and his name—Balhadra Das—could suggest to a rational person that he was "probably Hindu," (3) the prosecutor had permitted a black juror to be seated as an alternate, and (4) Das was the only juror stricken by the prosecutor who was perceived by anyone to be black. On the other hand, Clemmons' position that the prosecutor's explanation was a pretext for racial discrimination is arguably supported by the facts that the prosecutor (1) challenged a prospective juror who was in fact (we assume) black, (2) did not know whether Das was, in fact, Hindu, and (3) did not articulate why Hinduism might affect the juror's ability to sit in this particular case. On this record, reasonable minds might differ on whether the prosecutor's explanation should be credited. In particular, we find troubling the prosecutor's failure to articulate a connection between his concerns and the issues in this case. Nevertheless, the issue that confronts us is a credibility one with respect to which the trial court's judgment is entitled to great deference. Granting that deference, we are not prepared to say that its acceptance of the prosecutor's explanation as sincere was clearly erroneous.

■ Having accepted the district court's appraisal of the prosecutor's explanation, we must reject Clemmons' *Batson* challenge to his conviction. Even assuming, as we do, that counsel for Clemmons would have established that Das was black

had the district court permitted further inquiry, Clemmons' right to equal protection was violated only if the prosecutor engaged in *intentional* racial discrimination. *See Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) ("the invidious quality of the law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose"); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (same). Accordingly, if the prosecutor subjectively believed Das was of Asian–Indian origin and struck him because of uncertainty about his religious perspective, the fact that a black may have been excluded from the jury did not violate Clemmons' right to equal protection.

### B.

■ Clemmons also contended before the district court that Das' exclusion from the jury because he was black violated the Sixth Amendment right to a jury drawn from a fair cross-section of the community. Though the *Batson* decision expressly declined to consider the Sixth Amendment's import for peremptory challenges, 476 U.S. at 84–85 n. 4, 106 S.Ct. at 1716 n. 4, the Court's contemporaneous decision in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), explicitly held that the fair cross-section right does *not* apply to for-cause or peremptory challenges. Specifically, *Lockhart* held that "death qualifying" a jury—i.e., excluding jurors for cause in capital murder cases on the basis of their views on the death penalty—did not violate the defendant's Sixth Amendment rights. The Court observed:

> We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. The limited

circumstances or as binding trial judges by our illustrative list. Indeed, the Supreme Court stressed that trial judges must consider "all relevant circumstances" that might give

rise to an "inference of purposeful discrimination."
*Id.* at 748 (citations omitted).

scope of the fair-cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly "representative" petit jury, a basic rule that the Court of Appeals itself acknowledged for many years prior to its decision in the instant case. We remain convinced that an extension of the fair-cross-section requirement to petit juries would be unworkable and unsound, and we decline [the] invitation to adopt such an extension.

*Id.* at 173–74, 106 S.Ct. at 1764–65 (citations omitted). Clemmons' counsel does not assert, nor can we discern, any reason why the Court's holding in *Lockhart* does not compel the same result in this case.[4]

■■■ Even if it were the case that the Sixth Amendment prohibited the discriminatory use of peremptory challenges, Clemmons predicated his Sixth Amendment objection on the same allegation of intentional racial discrimination that formed the basis of his unsuccessful Fifth Amendment claim.[5] Because we accept the district court's determination that the prosecutor did not strike Das because of his race, we necessarily conclude that Clemmons' Sixth Amendment claim also fails.[6]

**4.** The Supreme Court may soon revisit the issue of whether the fair cross section requirement of the Sixth Amendment applies in the petit jury context in *Illinois v. Holland,* 121 Ill.2d 136, 117 Ill.Dec. 109, 520 N.E.2d 270 (1987), *cert. granted,* —— U.S. ——, 109 S.Ct. 1309, 103 L.Ed.2d 579 (1989), a case now before the Court. At this point, however, we believe *Lockhart* is the controlling precedent.

**5.** Unlike in equal protection cases, a claimant in a fair cross-section case need only establish that a jury selection procedure systematically results in the exclusion of members of a cognizable group. For example, in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court struck down a system of selecting jury pools that systematically excluded women, noting explicitly that the defendant need not show actual discriminatory intent to prevail. *Id.* at 368 n. 26, 99 S.Ct. at 670 n. 26 ("in Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section"). In this case, however, the defendant

## II.

■■■ Clemmons' two remaining arguments require only brief discussion. Both his indictment and the evidence at trial clearly suffice to support his conviction.

### A.

Clemmons' indictment alleged that he

did knowingly sell ... stolen United States Treasury bonds, to-wit, Series EE Savings Bonds which had been issued to Kent Madrishin ... said stolen bonds having an aggregate value in excess of $500 ... [in] violation of Title 18 United States Code, Section 510(b).

App. at 5. In turn, § 510(b) provides in relevant part that

[w]hoever, with the knowledge that such Treasury check or bond ... is stolen ... buys, sells, exchanges, receives, delivers, retains or conceals any such Treasury check or bond ... that in fact is stolen ... shall be fined not more than $10,000 or imprisoned for not more than 10 years, or both.

Clemmons insists that he understood the phrase 'knowingly selling stolen bonds' in the indictment to mean that he was cognizant only of the sale, and not of the fact that the bonds were stolen. As a result, he

neither claims, nor does the record support, a systematic exclusion claim. Clemmons argues only that his Sixth Amendment right was violated because the prosecutor engaged in deliberate racial discrimination.

**6.** On appeal, Clemmons argues for the first time that his Sixth Amendment rights were also violated if Das was challenged *on religious grounds.* In *Newark Morning Ledger Co. v. United States,* 539 F.2d 929 (3d Cir.1976), we made clear that "[w]e generally refuse to consider issues that are raised for the first time on appeal [and that only] in horrendous cases where a gross miscarriage of justice would occur [should this practice] be relaxed." *Id.* at 932. There is no potential for a gross miscarriage of justice here. Clemmons does not suggest that the juror seated in place of Das was in any way unqualified or that he failed to receive a fair trial for any other reason. Accordingly, we decline to pass upon the issues presented by this new contention, other than to note that *Lockhart* appears to present the same problem for Clemmons in this context as in the context of his racial discrimination argument.

argues, the indictment failed to inform him of an essential element of the offense charged in violation of Rule 7(c), Fed.R. Crim.P., and the Fifth Amendment. We believe this reading is unduly crabbed and that an objective reader would understand from the charging document that the grand jury found probable cause to believe that Clemmons sold bonds he knew were stolen.

### B.

Clemmons also argues that the evidence that he knew the bonds at issue were stolen was insufficient to convict him. As in all such cases,

> we must view the evidence and the inferences reasonably deducible therefrom in the light most favorable to the government … to determine if there is sufficient evidence to support the fact finder's verdict. "Only when the record contains no evidence regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict."
>
> Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred. The fact that evidence is circumstantial does not make it less probative than direct evidence.

*United States v. McNeill,* 887 F.2d 448 (3d Cir.1989) (citations omitted).

At trial, Clemmons himself testified that he received the bonds at issue in the parking lot of an apartment complex from an unidentified man named Chuck, who had "wanted to get rid of some or sell some bonds … cheaply or at a good price." App. at 195–98. Clemmons further testified that he knew that this Chuck wanted $2,500 in exchange for bonds with a face value of roughly $13,000, app. at 221, and that Chuck was not the named owner on the bonds. App. at 212. The government's principal witness, to whom Clemmons attempted to sell the bonds, added that Clemmons had claimed to have cashed some of the bonds with a fake ID matching the name on the bonds. App. at 77–78. Based on this circumstantial evidence, we conclude the jury could have reasonably inferred that Clemmons knew that the bonds were stolen. *See United States v. Gallo,* 177 U.S.App.D.C. 214, 543 F.2d 361, 368 (1976) (knowledge that goods are stolen may be inferred from willingness to buy or sell at a price substantially less than market value); *Torres v. United States,* 270 F.2d 252, 259 (9th Cir.1959) (same), *cert. denied,* 362 U.S. 921, 80 S.Ct. 675, 4 L.Ed.2d 741 (1960).

### III.

For the foregoing reasons, the judgment of the district court will be affirmed.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring in the judgment.

Although on the peculiar facts before us, the majority may have reached a technically correct result under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), I must note that I am troubled by this case. I have been similarly disturbed in the past year by a series of other cases where the *Batson* issue has been raised and where superficial or almost frivolous excuses for peremptory challenges with racial overtones have been proffered and accepted. I fear that *Batson* is fast coming to offer a theoretical right without an effective remedy.

I am particularly troubled here because the Assistant United States Attorney's "justification" for the peremptory challenge may reflect an inappropriate hostility to an American[1] who was called to an American court to perform one of the most important duties of citizenship. When the Assistant United States Attorney was asked by the trial judge why he used a peremptory challenge against Das, the following colloquy ensued:

> PROSECUTOR: For the record, I believe that this juror No. 2 is not, I

---

1. Although the record is silent on Das's citizenship status, I note that only U.S. citizens are eligible to serve on federal juries. 28 U.S.C. § 1865(b)(1).

think—my impression is that he is ... East Indian. He is not a black man, so—at least, not by heritage, I believe. My impression is blacks come from Africa, whereas Mr. Das, Juror No. 2, is clearly, to me, an Indian. And my reasoning in striking him was that I feel that he is probably Hindu in religion, and Hindus tend, in my experience and in talking it over with my counsel, to have feelings a good bit different than ours about all sorts of things, and I am just not certain he would—I am not certain of all those things, *and I can be more certain with an American juror,* and that was my primary reason for striking him. He may have religious beliefs that may affect his thinking.[2]

THE COURT: Well, let the record show that, according to the Court's own observation, Mr. Das is not of the black race. However, we will not question him about his race. We will not question him about his religion. I think that he probably is Indian or some other race. There is one man of the black race, according to my observation, on the jury panel, *and only one,* and, of course, he is not in controversy here, so I think [the prosecutor's] explanation is sufficient, so we need not make any other inquiry.

DEFENSE ATTORNEY: Your Honor, I would, for the record, however, say that the other black man is an alternate and therefore may not serve on the jury, and the other—

THE COURT: Well, he is not in controversy.

DEFENSE ATTORNEY: —and the other matter is that Baldhadra Das is a member of the colored race, and I am sure he considers himself as a member of the colored race.

THE COURT: I doubt if he would agree with that.

DEFENSE ATTORNEY: But, in any event, I think the explanation given by [the prosecutor] with respect to his guess that this man's religion is [in]sufficient[3]—

THE COURT: [The prosecutor's] explanation is that he is just uncertain.

DEFENSE ATTORNEY: Um-hum.

THE COURT: He is just uncertain about the man's background, beliefs. We will accept that, in view of the fact that I don't think he is of the black race and, generally, we would accept it.

App. at 57–58 (emphases added).

The prosecutor's comments signify a bias against a venireman solely because that individual is from a cultural or religious tradition that is out of the American mainstream. The Assistant U.S. Attorney explained that because Das was "probably Hindu," because "Hindus tend ... to have feelings a good bit different than ours about all sorts of things," and because Das may thus "have religious beliefs that may affect his thinking", the prosecutor would prefer an "American juror".

There is no support in the record for the prosecutor's implicit conclusion that Das is not an American citizen.[4] The more disturbing aspect of the prosecutor's comments, however, is his apparent suspicion that because members of a particular ethnic group look different or have different beliefs, they are not real "Americans," and thus cannot be trusted to serve as jurors or to perform other duties of citizenship.[5]

---

**2.** I find the prosecutor's assertion fascinating. One wonders whether the Assistant U.S. Attorney has been equally suspicious of Catholics, Jews, Protestants, Muslims, Jehovah's Witnesses or evangelical Christian sects because some of "them" may have different beliefs from some of "us"?

**3.** There is a handwritten correction, of undetermined origin, in the transcript, changing "sufficient" to "insufficient." App. at 58.

**4.** *See infra* note 1.

**5.** Racial discrimination in jury selection has tainted the American legal system since the colonial period.

Before the Civil War, nearly all states, through statute or custom, prohibited blacks from serving on juries. L. Litwack, *North of Slavery: The Negro in the Free States 1790–1860* 94 (1961). Although the statutory exclusion of blacks from jury duty was struck down by the Supreme Court in *Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880), legislatures, prosecutors, and jury commissioners have since developed an imaginative array of devices to bar blacks and other minorities from the jury

It is sad that in the late twentieth century, educated public officials still fall victim to racial or religious biases that preclude them from making an independent evaluation on the basis of an individual's character. However, since the religious issue was not raised at the trial court, the majority correctly holds that it cannot be considered here.[6] Thus, I must view the case solely in a racial context on appeal.

In this regard, I note that nearly all Hindus are of Indian origin.[7] I can also take judicial notice of the fact that many Indians do not look exactly like American whites, and are generally of a darker complexion. It is impossible to discern the prosecutor's racial views from his brief comments on this issue, and I do not mean to suggest that his peremptory challenge was motivated by overt or conscious racial bias. However, the proceedings in the district court leave unanswered the issue of whether the gravamen of the prosecutor's objection to Das was the latter's non-whiteness, or whether it was his supposed Hinduism without any consideration of the matter of color,[8] or whether there was some confounding of the two in his mind. I find it more difficult to dissect as neatly as the majority the intertwining cords of race and religion in this case.

box. *See, e.g., Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (blacks excluded through peremptory challenges); *Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (jurors selected by means of racially coded tickets); *Hill v. Texas,* 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) (jury commissioners selected jurors from among their personal acquaintances); *Neal v. Delaware,* 103 U.S. (13 Otto) 370, 26 L.Ed. 567 (1881) (selection of jurors from list of "sober and judicious" citizens); *Labat v. Bennett,* 365 F.2d 698 (5th Cir. 1966) (exclusion of hourly wage earners), *cert. denied,* 386 U.S. 991 (1967); *Rabinowitz v. United States,* 366 F.2d 34 (5th Cir.1966) (blacks excluded through "key man" system of panel selection, in which "respectable" citizens were asked to recommend other "good citizens" for jury duty); *U.S. ex rel. Goldsby v. Harpole,* 263 F.2d 71 (5th Cir.) (jury lists drawn from voter registration lists, from which blacks were excluded), *cert. denied,* 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959); L. Rice, *The Negro in Texas: 1874—1900* 255–57 (1971) (blacks excluded through subjective eligibility criteria for jury duty, jury commissioner discretion, literacy qualifications). *See generally* J. Bass, *Unlikely Heroes* 278–285 (1981) (race discrimination in jury selection in the Fifth Circuit during the 1950s and 1960s); D. Bell, *Race, Racism and American Law* 235–77 (2d ed. 1980).

Today, over one hundred years after *Strauder,* the integrity of the jury system is still threatened by sometimes blatant race discrimination on the part of government attorneys. As Justice Marshall noted in his *Batson* concurrence, an instruction handbook used by the Dallas, Texas prosecutor's office in the 1970s "explicitly advised prosecutors that they conduct jury selection so as to eliminate 'any member of a minority group.'" An earlier jury-selection guide used by those same prosecutors phrased this advice more bluntly: "Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or well educated." 476 U.S. at 104 & n. 3, 106 S.Ct. at

1727 & n. 3 (citations omitted). The government attorney in a recent § 1983 case, *Clark v. City of Bridgeport,* 645 F.Supp. 890 (D.Conn. 1986), candidly admitted that he struck eight out of eight black venirepersons on purely racial grounds. When asked to justify his peremptory challenges, he stated:

> [I]f I had a choice between a white juror and a black juror under the facts of these cases, I'm going to take a white juror. That's what I'm saying.... [W]hy should I put my city and my defendants at the mercy of the people in my opinion who make the most civil rights claims, at least in my experience[?] ...

*Id.* at 894.

Clearly, we are still some distance from our constitutional objective of colorblind jury selection.

6. In any event, it is unclear whether, on the facts of this case, Clemmons could have properly raised the religious issue, since he (presumably) is not Hindu.

7. The overwhelming majority of the world's Hindus live on the Indian subcontinent. According to the *Handbook of the Nations* (8th ed. 1988), Hindus make up 82.6% of India's population of over 800,000,000, 16% of Bangladesh's 110,000,000 inhabitants, and 15% of Sri Lanka's 16,600,000 citizens.

8. The prosecutor asserted that he was troubled by Das's possible religious beliefs, rather than his racial or ethnic background. However, in common usage the word "Hindu," in addition to identifying the religious faith, has often served as a shorthand reference to Asian Indians. *Webster's Third New International Dictionary* 1070 (1961) (defining Hindu as "a native or inhabitant of India"); *Webster's Second International Dictionary* 1180 (1948) (noting that in Continental and American usage, a "Hindu" may be "a member of one of the native races of India.")

I have recently seen other cases involving the *Batson* issue in which the prosecuting attorneys have offered nonracial justifications for peremptory challenges that strain credulity. In one case involving three black defendants, the prosecutor exercised peremptory challenges against the only two black persons in the venire panel. In the first instance, the prosecutor asserted that he exercised a peremptory challenge because the black panel member was a young, single, former Peace Corps volunteer who might sympathize with the defendant. In the other instance, the prosecutor explained that the black panel member was stricken because she was a social worker who also might be partial to the defendant. The prosecutor further explained that he made his challenges in order to eliminate young people and Philadelphians from the jury. However, one white panel member who was a young Philadelphia resident did not meet the same fate. *United States v. Selby*, 872 F.2d 414 (3d Cir.1989) (judgment order); *United States v. Green*, 875 F.2d 312 (3d Cir.1989) (judgment order).[9] In *United States v. Clemons*, 843 F.2d 741 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988), the prosecutor, who used peremptory challenges to strike the only two blacks on the venire panel, explained that his objective was to exclude from the petit jury all young, single individuals—although a white young, single venireperson was not subjected to a peremptory challenge by the prosecutor. In these and other cases involving the *Batson* issue, prosecutors have asserted that it was only the sheerest coincidence that all or most of the black jurors were excluded and that, of course, the exclusion of blacks was not racially motivated.

On any individual case on appeal, even a flimsy explanation may appear marginally adequate and be sustained. However, this cumulative record causes me to pause and wonder whether the principles enunciated in *Batson* are being undermined by excuses that have all form and no substance.

Justice Marshall predicted in his *Batson* concurrence that the decision would allow courts to remedy only the most flagrant instances of racial discrimination in jury selection. 476 U.S. at 105, 106 S.Ct. at 1727 (Marshall, J., concurring). Time and experience have proved him correct. Recent commentators note that *Batson* has left prosecutors free to strike jurors based on what amounts to patent stereotypes. *See, e.g.,* Serr and Maney, *Racism, Peremptory Challenges and the Democratic Jury,* 79 J.Crim.Law & Criminology 1, 43–47 (1988); Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure,* 135 U.Pa.L.Rev. 1365, 1420 (1987) (prosecutor may seek to justify strike on arbitrary grounds such as speech, hair style, demeanor). Indeed, the *Batson* standard, as it has been interpreted, appears now to allow prosecutors to strike non-white jurors for reasons that are clearly, but subtly, racial in nature:

> [U]nder the *Batson* formula, the prosecutor can easily articulate a non-race based reason for her peremptory challenge.... Moreover, in part because the prosecutor's prejudice may be subtle, unconscious, and shared by the judge, the prosecutor may be able to articulate non-racial explanations that the judge would find reasonable.

*Developments—Race and the Criminal Process,* 101 Harv.L.Rev. 1472, 1581 (1988) (footnote omitted). In the case at bar and in many others, the prosecution's peremptory challenges may betray underlying prejudices of precisely this nature.[10]

**9.** I was on the panel that entered the judgment orders in *Selby* and *Green.* I do not mean to question the propriety of the summary affirmance of the convictions in that case. However, I see the peremptory challenges at issue in those related appeals as part of a disturbing trend in jury selection appeals. As this court cautioned, prosecutors must be particularly cautious during jury selection to avoid "creating a circumstance which would be perceived as insensitive

to the rationale of *Batson v. Kentucky." United States v. Selby,* (3d Cir.1989) [872 F.2d 414 (table) ].

**10.** So long as peremptory challenges are permitted, trial and appellate judges will continue to have difficulty in ascertaining whether the prosecutor's motives in exercising peremptory challenges are good or bad.

Both prosecutors and the courts must act affirmatively to counter this trend. Prosecutors should be forever mindful that selecting jurors in a fair and nondiscriminatory manner is far more important than winning a case with highly suspect or questionable tactics. However, because the fifth and fourteenth amendments' guarantee of racial neutrality in jury selection is so vital to the integrity of our criminal justice system, the courts, when faced with a properly supported prima facie case under *Batson,* cannot rely solely or principally on the prosecutors' asserted good faith justification for the exclusion of minorities from the jury. Rather, the courts must take seriously our responsibility to determine whether the justification is "clear and reasonably specific", and that it is "related to the particular case to be tried." 476 U.S. at 98 & n. 20, 106 S.Ct. at 1724 & n. 20. At a minimum, this inquiry requires us to consider whether the prosecutor's rationale makes sense in light of the facts giving rise to an inference of discrimination.

Under the particular circumstances of this case—which include the uncertainty about Das's race, the selection of a black person as an alternate juror, and the absence of any other significant indicia of discrimination in the voir dire or at trial—I agree with the majority that the district court did not commit clear error in overruling the defendant's objection to the peremptory challenge. In my view, however, the holding in this case should not be taken to imply that an explanation for the peremptory challenge such as that proffered here would typically suffice to overcome a properly supported prima facie case under *Batson.*

---

Nevertheless, allegations of race discrimination in jury selection, and in other areas involving prosecutorial discretion, must be reviewed carefully. As Professor Steven Alan Reiss has observed:

Few officials can so affect the lives of others as can prosecutors. Yet few people operate in a vacuum so devoid of externally enforceable constraints. Indeed, contemporary efforts to constrain the discretion of actors in the criminal justice system have not only bypassed the prosecutor, they have tended to expand her power by squeezing the system's seemingly insoluble bubble of discretion her way.

Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure,* 135 U.Pa.L.Rev. 1365 (1987) (footnotes omitted).